UNIGARD SECURITY INSURANCE COMPANY, INC., successor to Unigard Mutual Insurance Company, Inc., Plaintiff–Appellant,

v.

NORTH RIVER INSURANCE COMPANY, Defendant–Appellee.

No. 197, Docket 91–7534.

United States Court of Appeals, Second Circuit.

Argued Sept. 23, 1991.

Decided Sept. 9, 1993.

Eugene Wollan, New York City (Michael H. Goldstein, Robert A. Stern, Mound, Cotton & Wollan, New York City, of counsel), for plaintiff-appellant.

Dennis G. Jacobs, New York City (Andrew S. Amer, Mary Beth Forshaw, Simpson, Thacher & Bartlett, New York City, of counsel), for defendant-appellee.

Before: WINTER and ALTIMARI, Circuit Judges, and POLLACK, Senior District Judge.*

WINTER, Circuit Judge:

Unigard Security Insurance Company, Inc., appeals from Judge Sweet's decision after a bench trial rejecting its late loss notice defense under a facultative reinsurance certificate with North River Insurance Company.[1] *See Unigard Sec. Ins. Co. v. North River Ins. Co.,* 762 F.Supp. 566 (S.D.N.Y.1991).

Judge Sweet held that, although North River's notice under the certificate was five months late, Unigard could not prevail on its late loss notice defense because it had failed to prove prejudice. He also held that Unigard was liable for expense costs that exceeded the policy liability limits. After oral argument, we certified to the New York Court of Appeals the question whether a reinsurer must prove prejudice to prevail on a late loss notice defense. The Court of Appeals held that prejudice must be shown.

---

* The Hon. Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

1. Unigard is a Washington corporation purchased in 1984 by John Hancock Mutual Life

*See Unigard Sec. Ins. Co. v. North River Ins. Co.,* 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992). We affirm in part because, although Unigard was not given notice of the signing of the so-called Wellington Agreement, it has not shown prejudice resulting from this lack of notice. We reverse in part because Unigard is not liable for expenses that exceed the reinsurance certificate's policy limits.

## BACKGROUND

We will briefly discuss the business of reinsurance and then turn to the facts of the instant case.

### A. THE BUSINESS OF REINSURANCE

■ Reinsurance occurs when one insurer (the "ceding insurer" or "reinsured") "cedes" all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer. *See* 13A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 7681, at 480 (1976); 19 George J. Couch, *Cyclopedia of Insurance Law* § 80:1, at 624 (2d ed. 1983). The reinsurer agrees to indemnify the ceding insurer on the risk transferred.

The purpose of reinsurance is to diversify the risk of loss, *see Delta Holdings v. National Distillers,* 945 F.2d 1226, 1229 (2d Cir.1991), and to reduce required capital reserves. *See Colonial Am. Life Ins. Co. v. Comm'r,* 491 U.S. 244, 246, 109 S.Ct. 2408, 2410, 105 L.Ed.2d 199 (1989). Spreading the risk prevents a catastrophic loss from falling upon one insurer. By reducing the legal reserve requirement, the ceding insurer then possesses more capital to invest or to use to insure more risks. *See* Bart C. Sullivan, *Reinsurance in the Age of Crisis,* 38 Fed'n Ins. & Corp. Couns. Q. 3, 4 (1987).

■ There are two basic types of reinsurance policies—facultative and treaty. *See generally* 1 Klaus Gerathewohl, *Reinsurance Principles and Practice* 64–128 (1980) (dis-

Insurance Company. North River is a New Jersey corporation and is a subsidiary of Crum & Forster, Inc.

cussing various types of reinsurance coverage). In facultative reinsurance, a ceding insurer purchases reinsurance for a part, or all, of a single insurance policy. Treaty reinsurance covers specified classes of a ceding insurer's policies. As the district court explained, a "typical treaty reinsurance agreement might reinsure losses incurred on all policies issued by the ceding insurer to a particular insured, while facultative reinsurance would be limited to the insured's losses under a policy or policies specifically identified in the reinsurance agreement." *Unigard*, 762 F.Supp. at 572 n. 2.

The reinsurer is not directly liable to the original insured. *See Unigard*, 79 N.Y.2d at 582, 584 N.Y.S.2d 290, 594 N.E.2d 571. Reinsurance involves contracts of indemnity, not liability. *Id.* at 582–83, 584 N.Y.S.2d 290, 594 N.E.2d 571. Reinsurers do not examine risks, receive notice of loss from the original insured, or investigate claims. *Id.* at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571. In practice, the reinsurer has no contact with the insured.

To enable them to set premiums and adequate reserves, *see Delta Holdings*, 945 F.2d at 1229, and to determine whether to "associate" in the defense of a claim, reinsurers are dependent on their ceding insurers for prompt and full disclosure of information concerning pertinent risks. The reinsurance relationship is often characterized as one of "utmost good faith." This utmost good faith may be viewed as a legal rule but also as a tradition honored by ceding insurers and reinsurers in their ongoing commercial relationships. Historically, the reinsurance market has relied on a practice of the exercise of utmost good faith to decrease monitoring costs and *ex ante* contracting costs. Reinsurance works only if the sums of reinsurance premiums are less than the original insurance premium. Otherwise, the ceding insurers will not reinsure. For the reinsurance premiums to be less, reinsurers cannot duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims. Reinsurers may thus not have actuarial expertise, *see Delta Holdings*, 945 F.2d at 1241, or actively participate in defending ordinary claims. They are pro-

tected, however, by a large area of common interest with ceding insurers and by the tradition of utmost good faith, particularly in the sharing of information. Because repeat transactions are the norm, reputation is thus important to commercial success and the loss of repeat business is a penalty that usually outweighs the short-term gains of misrepresentations or stonewalling contractual obligations. The New York Court of Appeals thus recently commented: "This appeal calls upon us to resolve a question of reinsurance law—a field in which differences have often been settled by handshakes and umpires, and pertinent precedents of this court are few in number." *Sumitomo Marine & Fire Ins. Co. v. Cologne Reins. Co. of Am.*, 75 N.Y.2d 295, 298, 552 N.Y.S.2d 891, 552 N.E.2d 139 (1990).

However, in recent years, the reinsurance market has witnessed an increase in participants and a decline in profitability due to huge environmental losses. This has led some commentators to question the continued vitality of utmost good faith as a description of the current practices in the reinsurance market, *see* Eugene Jericho, *Insurance and Reinsurance Disputes*, 55 Def. Couns. J. 289, 289 (1988), and argue that the market is now one of *caveat emptor*. John Milligan–Whyte & Mary Cannon Veed, *Bermudian, English and American Reinsurance Arbitration Law and Practice and Alternative Dispute Resolution Methods*, 25 Tort & Ins. L.J. 120, 124 (1989). *See also Unigard*, 762 F.Supp. at 591 (noting that the customs and practices of reinsurance had changed due to the "overwhelming pressures" of huge environmental losses like asbestos); Steven W. Thomas, Note, *Utmost Good Faith in Reinsurance: A Tradition in Need of Adjustment*, 41 Duke L.J. 1548, 1558–61 (1992).

If these commentators are correct, the reinsurance industry may encounter severe difficulties. It involves a market that has relied upon informal understandings and practices that cause participants to act toward each other with the good faith expected of joint venturers. Whether the industry can thrive if these understandings and practices are eroded and replaced by litigation is an open question.

## B.  THE FACTS

### 1.  *The Insurance Policies*

The reinsurance contract at issue in the instant case is facultative.  North River, through its agent L.W. Biegler, Inc., also a subsidiary of Crum & Forster, issued two excess insurance policies to Owens–Corning Fiberglass Corporation in July 1974—XS–3619, a second-layer excess policy, and XS–3672, a third-layer excess policy.  Both policies provided coverage for, *inter alia,* claims for asbestos-related bodily injuries.  North River purchased reinsurance to cover 100 percent of its liability risk under XS–3672.

Unigard was one of the reinsurers under XS–3672.  North River issued XS–3672 to Owens–Corning for coverage of $30 million, payable if losses exceeded the $76 million in underlying excess and primary coverage.  XS–3672 covers three policy periods:  (A) July 9, 1974 to October 22, 1974;  (B) October 22, 1974 to October 22, 1975;  and (C) October 22, 1975 to October 22, 1976.

Unigard, through its managing general agent Allen Miller and Associates, Inc. ("AMAI"), issued to North River Certificate of Facultative Reinsurance No. 1–5143 (the "Certificate") to reinsure one-sixth of the risk of XS–3672.  The reinsurance for policy period (C) was cancelled by endorsement effective October 22, 1975.

The relevant terms of the coverage under the Certificate are as follows:

[*Follow the Form Clause*]

A.  ... [T]he liability of [Unigard] shall follow that of [North River] and, except as otherwise provided by this Certificate, shall be subject in all respects to all the terms and conditions of [North River's] policy except such as may purport to create a direct obligation of [Unigard] to the original insured or anyone other than [North River].

. . . .

[*Notice of Loss Clause and Claims Association Clause*]

C.  Prompt notice shall be given by [North River] to the Underwriting Managers on behalf of [Unigard] of any occurrence or accident which appears likely to involve this reinsurance and while the Underwriting Managers or [Unigard] do not undertake to investigate or defend claims or suits, the Underwriting Managers, directly or through its representatives and/or counsel, shall nevertheless have the right and be given the opportunity to associate with [North River] and its representatives at [Unigard's] expense in the defense and control of any claim, suit or proceeding which may involve this reinsurance with the full cooperation of [North River].

[*Follow the Fortunes Clause*]

D.  All claims covered by this reinsurance when settled by [North River] shall be binding on [Unigard], who shall be bound to pay their proportion of such settlements.  In addition thereto, [Unigard] shall be bound to pay (1) their proportion of expenses, other than [North River's] salaries and office expenses, incurred by [North River] in the investigation and settlement of claims or suits, and (2) their proportion of court costs, interest on any judgment or award and litigation expenses (provided their prior consent to legal proceedings has been obtained from the Underwriting Managers) as follows:  (a) with respect to reinsurance provided on an excess of loss basis, in the ratio that [Unigard's] loss payment bears to [North River's] gross loss payment. . . .

### 2.  *The Asbestos Crisis and the Wellington Agreement*

By the early 1980's, asbestos-related personal injury lawsuits were pending in virtually every court system.  *See Unigard,* 762 F.Supp. at 572.  An estimated $1 billion was spent in connection with these actions by the end of 1982, with less than 40% of the funds ever reaching the injured victims.  *Id.*  By 1983, approximately 25,000 lawsuits had been filed against asbestos producers.  *Id.* at 573.  These claims were the subject of protracted litigation between the producers of asbestos-related products and their insurers.

Owens–Corning's 1984 Form 10K, filed with the Securities and Exchange Commission, reported 19,131 asbestos-related bodily injury claims pending against it as of Decem-

ber 31, 1984. The average settlement per claim was $10,454. By the end of 1985, that figure had risen to $10,708 per claim. *See id.*

As a result of the massive liability for asbestos-related claims, the expense of litigation between producers and their insurers, and the administrative costs of managing nationwide litigation and claims, an Agreement Concerning Asbestos–Related Claims, known as the Wellington Agreement, was signed by producers of asbestos and their insurers on June 19, 1985. Crum & Forster and its subsidiaries, including North River, became signatories, as did Owens–Corning. The Agreement established the Asbestos Claims Facility ("the Facility") to "administer and arrange for the evaluation, settlement, payment or defense of all asbestos-related claims against Subscribing Producers and Subscribing Insurers in accordance with the provisions of the Agreement...." Moreover, as "sole agent, the Facility [had] *exclusive* authority and discretion to administer, evaluate, settle, pay or defend all asbestos-related claims." (emphasis in original).

Once the Facility settled a claim, the liability amount and the defense costs were allocated among the producers of asbestos, such as Owens–Corning, according to a producer-allocation formula. The producer-allocation formula was actually two formulae, one for indemnity (or to pay the actual claim) and one for defense costs. "[T]o share indemnity, each producer's historical average cost by state was multiplied by that producer's pending claims in that state. And the product was summed and a percentage was determined for each producer as a total of all producers." Testimony of Martha Wilke–Murray. Regarding "defense costs, the allocation was derived by taking each producer's number of pending claims, divided by the total number of pending claims for all producers combined." *Id.* Thus, these allocations would likely change if new producers joined the Wellington Agreement.

The Agreement provided the method by which producers would allocate their shares among its insurers—the insurance-allocation formula. Each producer had an initial coverage block from the first day that the producer started manufacturing asbestos products to a date between 1973 and 1979, depending on the producer. This coverage block included all of the producer's insurance policies in all layers, or levels of coverage. The coverage rules that allocated payments among insurers were based on *Keene v. INA,* 667 F.2d 1034 (D.C.Cir.1981).

The Agreement spread losses to policies based on each claimant's first exposure date through that claimant's diagnosis date ("the exposure period"). Thus, any policy in the layer at issue that covered a portion of that exposure period and that was not already exhausted would pay a percentage of the claim based on the number of days covered by that policy divided by the total number of days in the exposure period. If a policy or layer became exhausted, the next excess policy or layer would then be obliged to pay.

Accordingly, if there was a "vertical drop," an area in a layer in which a policy was exhausted, the policy in that period from the layer above would drop down and pay. Similarly, if there was a "horizontal gap" in an exposure period, where a nonsignatory insurer (an insurance company who did not join the Agreement) had a policy in the exposure period but was not paying through the Agreement, the insurers on each side of that policy collapsed around and paid the entire amount of the claim. Defense costs were handled in the same manner.

### 3. *Crum & Forster's Handling of Claims*

Martin Bondy, Senior Vice–President in charge of Crum & Forster's Insurance Operation Department, distributed a memo on February 23, 1982 that outlined the issues Crum & Forster faced regarding asbestos claims. The memo contained the heading "Re: Asbestosis," and stated in pertinent part:

> To date, we have been working on this subject on a somewhat fragmented, ad hoc basis, dealing with related matters one at a time. In view of the importance of the subject, it seems timely to get our heads together to deal with all aspects of the problem in a coordinated way. A brief list of the topics for consideration is:

*Internal*

1. Should a single entity handle all asbestosis claims? Don McComber's position on this is clear—that our individual profit centers should each manage their own claims.

2. Should a single entity coordinate the methods of handling asbestosis claims? If so, who should comprise that entity?

3. Should a single entity be the statistical coordinator? If so, who? This includes the question of the types of information required on such cases.

4. How can we serve our best interests with respect to the reinsurance protection currently afforded under our contracts. How about wording of future contracts?

5. How should we handle reinsurance interface[?]
   a) Treaties—C & F
   b) Treaties—Individual PC's
   c) Facultative

6. How should loss reserves be handled?

7. How can we determine company exposures?

Ian R. Heap, who replaced Bondy as Senior Vice–President in charge of Crum & Forster's Insurance Operation Department in 1981, continued to pursue these goals. In 1983, Crum & Forster created a unit, eventually titled the Environmental Claims Unit ("ECU"), to coordinate and control, but not to manage, environmental and asbestos claims for all of Crum & Forster's insurance affiliates. Heap slowly built the ECU out of two existing asbestos claims units.

Crum & Forster was organized into different profit centers, each with its own claim department that handled its center's claims. The ECU provided guidelines and counseling to each profit center to promote consistency on policy issues. The ECU "was not directed to interject in the specific handling of the claim. It remained in the hands of the profit center." Heap testified that although it was suggested that all claim information be consolidated for the purpose of reporting to reinsurers, "the reason that management of reinsurance was not taken out of the hands of the profit centers was because profit centers were held strictly accountable for the results of their business," including recoveries from reinsurers. Heap further testified that although the ECU could set policy, the individual profit centers had the responsibility to decide when reinsurance reporting, including notice of loss, would occur. Once a profit center determined that notice of loss was appropriate, it was then the responsibility of the unit that placed the reinsurance to give the reinsurer notice. Heap testified that during his tenure, which ended in January 1986, the ECU did not develop reinsurance reporting practices distinct from the Crum & Forster reporting practices in existence previously.

Heap also formed the Environmental Claims Control Group ("ECCG") consisting of a "representative senior management group of all the disciplines, functional activities, and the business units." In a memo of April 7, 1983, Heap described the purpose of the ECCG:

> To ensure that all corporate interests of Crum & Forster, Inc. will be adequately protected and represented in all situations that now exist or may develop relating to claims against or by insureds of C & F companies which arise through asbestosis or related disease.
>
> To provide the means for identifying issues and specific problems and coordinating any multi-functional activity or support which may be required; and to ensure that the total body of information and data concerning asbestosis claims and their handling is collected and made available for access by everyone in C & F having a need for such information.

Heap testified in his deposition that the ECCG was a management tool to help monitor and coordinate a policy for asbestos claims.

On July 9, 1984, the ECU released a "Status Report [on] Asbestos–Related Claims." The Status Report assigned an account rating of "2" to the Owens–Corning account underwritten by Biegler, which included XS–3672. The Status Report defined the "2" rating as follows: "Account is being actively followed as there is either the probability of

active participation in the near future and/or critical information is required which will either cause us to be involved or absolved." On August 14, 1984, Heap distributed a memo that stated in pertinent part:

[W]hile we are positive about the [Wellington] Agreement and the benefits which are in the public interest, the case is not yet made for Crum and Forster to subscribe to the Agreement. However, we have taken the positive step of asking our principal reinsurers if they will support us should we decide to subscribe to the Agreement.

. . . .

To summarize:

—If major producers which we insure do not subscribe, it detracts from the Facility's benefits to us.

—If reinsurers will not support our subscription to the Facility, it increases the business risk greatly of subscribing to the Facility.

—If the expense allocation is not changed, we will be making a major contribution for what could be a minor benefit.

Heap testified in his deposition that he "instructed that all reinsurers with whom we had done business be put on notice of our consideration of the Agreement, and in asking for their views."

In the spring of 1985, the ECU produced an "Account Review and Analysis of Impact Upon Crum and Forster" for Owens–Corning under the heading "Asbestos Claim Facility, Wellington Agreement, Coverage Reconciliation." Under the subheading "Analysis–Recommendations" that document stated in pertinent part:

a. Our 6/18/74 to 9/1/76 excess policies are within the initial coverage block and could possibly become attached, especially at the 2nd excess levels if we deal with the claims within the Facility.

. . . .

c. Per Dan Phillips of Owens Corning, most of the primary coverage has been exhausted although he doesn't have the exact breakdown.

Three of our excess policies effective during the initial block years are over $26 million and stand a good chance of being attached if the claims are handled in the Facility when the payments previously made are reallocated from the post block years. This would result in a charge of about $7 million for each of the 24 years. Thus, our layers could be reached in 2 to 3 years.

Those same policies would be reached in about 3 to 5 years if handled outside of the Facility.

.     .     .     .     .

d. Whether in or out of the Facility, this account has the potential for our policies to be impacted at some time in the future.

Finally, Heap testified that the answers received from Crum & Forster's inquiry to reinsurers regarding its signing the Wellington Agreement and joining the Facility "followed almost a boilerplate that there was no comment as to the Facility and merely that the reinsurers would honor the contract under its terms and conditions as individual cases were submitted." Heap summed up the reaction of reinsurers in his memo of June 21, 1985, shortly after Crum & Forster signed the Wellington Agreement:

Crum and Forster originally subscribed to this Agreement on condition that there was an acceptable level of support by reinsurers, and I will describe the grounds on which this condition was seen to be satisfied before we actually executed the final Agreement.

. . . .

It was not expected that there would be unanimity by reinsurers in acceptance of the Agreement, nor was it expected that any reinsurers would be willing to sign a blank check for recoveries on asbestos-related claims, but it was necessary that insurers attain an acceptance by reinsurers of the basic principles of the Agreement and agree that payments made by the Facility would be seen to be good payments for the purpose of reinsurance recoveries. It was always understood that reinsurance recoveries for facility claim payments would be subject to the terms and conditions of the treaty or certificate language, and it is understood that with or

without the Facility there will inevitably be differences of opinion between insurers and reinsurers on such matters as the definition of "occurrence" and other coverage issues.

The memo then detailed which reinsurers were or were not participating. The memo did not mention Unigard.

### 4. Unigard's Handling of Claims

AMAI went out of business in 1976. Thereafter, Unigard ceased writing facultative reinsurance but continued to handle claims from the AMAI business through a Facultative and Excess Claims Department, which apparently handled only AMAI business. Byron Todd was an executive adjuster in the department from 1976 until mid–1981. Jerry Killen was a member of the Reinsurance Assumed Department ("RAD"), which handled treaty reinsurance, from at least 1976 until his retirement in May 1984. However, from 1976 until March 1980, he "related to the [AMAI] function," as "a person to whom certain types of coverage questions and background information on the writing of [AMAI] contracts would be addressed." In mid–1981, Todd became Claims Manager of RAD and thereafter handled only treaty reinsurance.

Sometime prior to 1982, Joe Dean, an Assistant Vice–President of Unigard, became head of the Facultative and Excess Claims Department and was thus responsible for the AMAI business. In 1982, Richard Maydahl assumed Dean's position with the title of Director of Facultative and Excess Claims. During this period, the department's name was changed to the Facultative and Special Risk Department ("FSRD"). The function remained the same—to handle the "run-off" business of the AMAI facultative and excess policies, that is, to handle only the claims being made on the old certificates because no new business was being written. By 1982, the run-off business of AMAI required only Maydahl and a secretary. Maydahl remained in this position (with a promotion to Vice–President) until his retirement in May of 1986. Upon his retirement, the files for the AMAI business were transferred to the Boston offices of Hanesco, another John Hancock affiliate. William Hutt took responsibility for the AMAI business, and he reported to Gerald Guilbert.

In 1983, Richard Brown became President of Unigard, and remained so until 1986. In June of 1984, Charles Palmerton became Vice–President and General Claims Manager of Unigard. Maydahl and Todd then each reported to Palmerton. However, FSRD and RAD did not share offices, equipment, or personnel, and never cross-handled claims.

### 5. Notice Concerning the Wellington Agreement

Crum & Forster sent the following telex, through its reinsurance intermediary, to Unigard on July 18, 1984:

> CRUM AND FORSTER HAS BEEN ASKED TO JOIN THE ASBESTOS CLAIMS FACILITY AND IS GIVING SERIOUS CONSIDERATION TO THIS PROPOSAL. AS PART OF OUR DELIBERATIONS, WE ARE SEEKING A CONSENSUS REACTION TO SUCH A MOVE FROM THOSE REINSURERS WHO HAVE PARTICIPATED OVER THE YEARS ON OUR GENERAL CASUALTY, COMPREHENSIVE CATASTROPHE AND CASUALTY CONTINGENCY REINSURANCE TREATIES.
>
> WE ARE INFORMED THAT THE ASBESTOS CLAIMS FACILITY HAS THE OVERWHELMING SUPPORT OF LLOYDS AND LONDON REINSURANCE MARKETS AS WELL AS STRONG INDICATIONS OF SUPPORT FROM DOMESTIC REINSURERS. WE WOULD REQUEST THAT YOUR OFFICE ADVISE REINSURERS OF THE POSSIBILITY OF OUR JOINING THE FACILITY AND SOLICIT THEIR REACTIONS TO SUCH A MOVE. AS THE TIME. CONSTRAINTS ARE RATHER PRESSING, WE WOULD ASK THAT YOUR OFFICE AND OUR REINSURERS GIVE THIS MATTER PROMPT ATTENTION.

The text of the telex was taken from a form letter sent to reinsurers through their intermediaries, signed by Hugh O. Sweeney of Crum & Forster. Heap testified that "the Sweeney letter was written at my instruc-

tion. I might not have seen the specific letter, but I saw a text of the letter that went out." Heap did not explain why the Sweeney letter referred only to treaty reinsurance. However, Heap also testified that the Sweeney letter was "not a notice of loss. It was company's disclosure of an action that Crum & Forster was considering to take, and that, to my mind, is the proper business practice between the [ceding insurer] and the reinsurer."

Although the telex was addressed to Jerry Killen, he had left Unigard two months earlier. The telex was received by Shanley Van Ditto, who worked in the RAD. Van Ditto testified in her deposition that Donna Dinsmore wrote on the telex the treaties to which the telex applied: "1st & 2nd Comp Cat Liab XS # 2415/2416." Van Ditto then testified that these treaties were retroceded under a retrocession agreement to California Reinsurance Management Corporation ("CalRe") in October 1983, to whom Unigard had retroceded the "General Casualty, Comprehensive Catastrophe and Casualty Contingency Reinsurance Treaties" referred to in the telex. Van Ditto thus referred the telex to CalRe.

Further notations on the telex indicated that Van Ditto had a conversation with Robert Olson, the underwriter for CalRe, on July 26, and that a copy of the telex was forwarded to him on July 27. A notation on the telex, in Van Ditto's handwriting, also stated that "[h]e will get back to us." Finally, Van Ditto testified that this process was consistent with standard procedures. To Van Ditto's knowledge, no response was ever given by CalRe to Unigard or to Crum & Forster.

Unigard was also contacted by other ceding insurers, all in regard to treaty reinsurance. Brown testified at his deposition that Unigard took the position that "each individual case needed to be evaluated on its own specific merits." He explained the reasoning for this position as follows:

[T]here were essentially two reasons.... The first is that at the time we're discussing there had not been that many individual cases, to the best of my recollection, recorded in the company. And secondly, there are various things that need to be evaluated with respect to each individual case.

First of all, since we had no broad track record, such things as limits of liability, number of people involved, culpability of the individual manufacturer or insured, primary insured, what the wording of the specific treaty itself was with regard to the exposures, all were part of the evaluative process, and as a result, each one of those cases needed to be evaluated based on the individual case information that was available.

For example, another subsidiary of Crum & Forster, Industrial Indemnity, through its reinsurance intermediary, Guy Carpenter & Co., Inc., sought the reaction of its "reinsurers who have participated over the years in [Industrial's] Workers' Compensation and Liability Excess of Loss Reinsurance Treaties" to Industrial joining the Facility. The letter was addressed to Van Ditto. She replied to Industrial that Unigard had no objection. She testified in her deposition that because Unigard had retroceded those treaties to CalRe, this was per CalRe's decision.

On August 15, 1984, Todd sent an interoffice memo to Palmerton regarding the Facility. The memo stated in pertinent part:

We have been contacted by two [ceding insurers] concerning membership in the claim facility.... It is my present thought that as reinsurers we should look at each reinsured separately to determine our position. If we do not make any recommendations we can take exception to individual claims as they are presented if they violate the reinsurance contract because of membership in the facility.

However, as noted above and discussed below, Unigard did respond to several ceding insurers who made requests. Matthew Murphy, a Vice–President of L.W. Biegler, Inc., wrote the following letter to Todd on October 9, 1984:

Your firm assumed various participations in the captioned reinsurance agreement throughout the mid–1970's. As you know, we have received notice of asbestos-related claims against holders of policies reinsured by the captioned agreement.

Our industry is confronted by an enormous challenge in the form of asbestos claims. To promote equitable claims adjustment and attempt to limit undue exposure to this Company and reinsurers, we are considering joining in the Inter–Company Agreement Concerning Asbestos Related Claims [Wellington Agreement]. A duplicate of the entire draft agreement is attached for your review.

Will you take an opportunity to review this draft and favor us with your remarks regarding your acquiescence to our participations in the Asbestos Claims Facility.

Please feel free to contact us with inquiries that you may have.

There was no captioned reinsurance agreement on the letter. The only heading was "ASBESTOS CLAIMS FACILITY." At Todd's deposition, he was not asked to what "captioned reinsurance agreement" referred, and Murphy's deposition, if taken, is not in the record. Todd did testify, however, that he answered only letters that referred to treaties, and he answered the letter on January 15, 1985 as follows:

I first want to advise you that Unigard's management has decided not to join the facility but I hasten to state that Unigard is not a large writer of coverages in which asbestos is involved. We had a short lived excess and surplus lines operation which does have a little exposure on both the facultative reinsurance basis and the excess basis [AMAI] but otherwise we do not have sufficient claims to merit joining.

My own personal belief is that this facility would be a good one for a company in your position which did write considerable cover for the various asbestosis involved companies. I believe that from a standpoint of concentrating expertise, efficient claims handling through one source and presenting a favorable image to the general public for the insurance industry this is a plus and certainly as a participant in your various treaties we would welcome claim handling by that facility.

Todd sent a briefer but similar letter in response to an inquiry from Continental Insurance Company.

However, Palmerton, Todd's superior, testified in his deposition that Todd's letters did not represent the official position of Unigard. Palmerton testified that his "instructions to [Todd] were then, and would be now, that he was not to expand on Unigard's decision not to join the Wellington agreement, and not to give advice to cedents that we would expand coverage under their contract because of the Wellington agreement." Unigard's decision not to join the Wellington Agreement was communicated to John F. Shea, Jr., Chairman of the Asbestos Claims Council, by an October 19, 1984 letter from Brown, which stated in pertinent part:

After reviewing all of the material available to us, we have elected not to participate in the Asbestos Claims Facility. This is not to say that it does not have merit as a mechanism for treating asbestos claims, merely that it does not fit our writings and exposures.

Brown testified in his deposition that the decision not to join the Wellington Agreement was based at least in part on the minimal asbestos exposure of its insureds and ceding insurers. Palmerton testified that the "decision to not join the Wellington agreement was based on the fact that we felt it expanded contracts, that were never intended to be expanded, that had to do with direct business, excess business and reinsurance business." Palmerton also testified that any discussions he had with Todd relating to the joining of the Wellington Agreement were focused on its effect on Unigard's treaty reinsurance.

### 6. Owens–Corning's Withdrawal From the Facility

Owens–Corning terminated the Facility's authority to handle claims asserted against it after October 3, 1987, and thereafter assumed responsibility for handling the post-October 3 claims itself. Approximately one year later, Owens–Corning withdrew its pending claims from the Facility as well. Owens–Corning settled and paid 100% of the claims filed after October 3, 1987 itself, and was therefore no longer subject to the producer-allocation formula. The Facility was dissolved by a vote of its members as of

October 1988 but still exists to conclude its business.

### 7. *Notice to Unigard From North River of Possibility of Payments Under XS–3672*

As set out in the district court's opinion, *see* 762 F.Supp. at 582–86, on March 13, 1987, the Facility informed North River that the layers underlying XS–3619 had been exhausted and that all pending claims would be tendered to the excess policies on the next layer, including XS–3619. As a result of the penetration of XS–3619, on April 1, 1987 North River posted case reserves for the full amount of XS–3619, $75 million. Also on April 1, Arthur P. Kirkner, Vice–President and Manager of the ECU, sent a memorandum to Crum & Forster Managers Corporation of New York ("CFMCNY"), the entity responsible for transmitting notices of loss to reinsurers, which contained a "first-notice type report" to be "forwarded to participating reinsurers on XS–3619, ... and XS–3672." 762 F.Supp. at 583.

On June 30, 1987, North River decided to send precautionary notices to the reinsurers of XS–3672. North River's expert, Robert F. Hall, testified that "precautionary loss notice is a loss notice given to a reinsurer on a policy wherein the reserve has not yet been established." After Kirkner retired and was replaced temporarily by Robert DeMaria, the ECU instituted a precautionary loss notice policy for environmental risks. North River had not posted reserves for XS–3672 at this time.

On August 18, 1987, CFMCNY sent a notice of loss to Unigard for Certificate of Facultative Reinsurance No. 1–5143, which reinsured XS–3672. The form of notice was virtually identical to the report that Kirkner had prepared for reinsurers in April, with only the date and the author's name changed. Unigard received the notice on or about September 2, 1987. North River had still not yet posted case reserves for XS–3672. On January 21, 1988, Unigard sent North River a letter disclaiming reinsurance coverage under the Certificate for any losses incurred under XS–3672. In March 1989, North River received its first bill under XS–3672 for

payments made by Owens–Corning in February 1989.

### 8. *Payment of Claims by North River to Owens–Corning*

Martha Wilke–Murray was an executive vice-president of Peterson Consulting, which was retained by the asbestos producers to assist them in developing the allocation formulas adopted by the Wellington Agreement and in administering the Facility. Wilke–Murray also prepared the bills that Owens–Corning sent to its insurers for its payment of the post-Facility claims and defense costs (claims filed after Owens–Corning's withdrawal from the Facility). She was a witness for North River. She testified at trial that "Owens–Corning continues to bill, as using the rules of Wellington, the insurers that are currently paying at the level of their coverage block." Moreover, in response to the question, "Did the dissolution of the facility affect the way in which Peterson calculates the bills to Owens–Corning insurers?", she responded: "The coverage rules of Wellington and how losses are spread to the coverage block are perpetual and they continue, so that portion of the bill would be the same." (XS–3672 was triggered after the Facility dissolved.) She did state that because Owens–Corning was "out there settling their own cases," Peterson would no longer have to compute the producer share amount.

The testimony that the Wellington insurance-allocation rules continued to govern payments after Owens–Corning withdrew and after the Facility was dissolved was amply supported in the record by several facts: (i) North River's letter to Unigard that accompanied the first bill (June 1, 1989) for indemnity under 1–5143 of XS–3672 stated that "North River continues to maintain that *all* payments it has made pursuant to the Wellington Agreement are covered by its reinsurance contracts, including Unigard's Facultative Certificate No. I–5143." (emphasis in original). (ii) Counsel for North River, in describing the February 1989 bill of Owens–Corning to its insurers (including North River for XS–3672), stated: "[T]his billing reflects the implementation of the Wellington Agreement principles...." (iii) In response

to interrogatory # 4 North River stated that "payments made by North River pursuant to the Wellington Agreement under XS–3672(A) and XS–3672(B) are covered by Unigard's Facultative Certificate because they constitute a reasonable and good faith business compromise with respect to North River's obligations to make payments on behalf of OCF for losses arising out of asbestos-related bodily injury claims asserted against OCF." (iv) The June 1, 1989 bill (like subsequent bills) to Unigard checked the "yes" box under "Facility Processed Claims." Answering Interrogatory # 10, North River stated that the phrase, "facility-processed claims," as used in the June 1 bill "refers to claims that were processed and billed by Peterson & Company on behalf of OCF pursuant to the terms of the Wellington Agreement." North River further stated that Facility Processed Claims did not refer to claims that were paid through the Facility. (v) In the letter accompanying the November 22, 1989 bill, John Butler, the Manager of the Environmental Reinsurance Claims of the Reinsurance Claim Unit, stated: "North River maintains the basic position that all payments made pursuant to the Wellington Agreement are covered under its reinsurance contracts pursuant to the principal [sic] of 'follow-the-fortunes' articulated in such contracts. This includes payments to the Asbestos Claim Facility (ACF) and to Owens–Corning directly."

### 9. *The District Court Decision*

Unigard sought a declaratory judgment relieving it of any obligation under the Certificate to indemnify North River for losses paid by North River to its insured, Owens–Corning. North River counterclaimed to recover such indemnification. *See* 762 F.Supp. at 570.

The district court found that the Wellington Agreement did not affect the coverage of XS–3672 and that therefore none of the claims billed to Unigard "were paid under the Wellington Agreement." 762 F.Supp. at 587. The court concluded that because the claims paid by North River under XS–3672 were settled after Owens–Corning's withdrawal from the Facility, "[n]one of the as-

bestos bodily injury claims covered under XS–3672 was settled as a result of the Wellington Agreement or settled by the Facility." *Id.* at 585. As a result, the court held that Unigard was not deprived of its right to associate in the resolution of the asbestos claims covered under XS–3672 and that Unigard's right to associate in the decision to sign the Wellington Agreement "is not a question which is before the Court." *Id.* at 587. The district court also held that the doctrine of utmost good faith did not require North River to give Unigard notice of its signing of the Wellington Agreement. *Id.* at 588.

The court did find that North River should have given notice to Unigard on April 1, 1987, when North River determined that the layer beneath XS–3672 was penetrated. *Id.* at 591. The court thus found that the "delay of five months before ... notice was received by Unigard must be considered untimely." *Id.* at 592. Although the district court found that prejudice was required for the reinsurer to prevail on a late notice defense, the court held that Unigard had not shown prejudice. *Id.* at 593–94.

Finally, the district court held that Unigard must pay expenses in excess of the limits of the Certificate. *Id.* at 594. The court rejected Unigard's argument that our decision in *Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910 (2d Cir.1990), mandated otherwise.

After hearing oral argument, we certified to the New York Court of Appeals the following question: "Must a reinsurer prove prejudice before it can successfully invoke the defense of late notice of loss by the reinsured?" *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 949 F.2d 630, 632 (2d Cir.1991). The Court of Appeals answered that question in the affirmative. *See Unigard Sec. Ins. Co. v. North River Ins. Co.*, 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992).

### DISCUSSION

A. PAYMENTS MADE BY NORTH RIVER UNDER XS–3672 WERE PURSUANT TO THE WELLINGTON AGREEMENT

■ The district court found that because claims covered by XS–3672 were paid by

Owens–Corning only after Owens–Corning withdrew from the Facility, 762 F.Supp. at 577–78, the Wellington Agreement did not affect the coverage of XS–3672 because none of the claims billed to Unigard "were paid under the Wellington Agreement." *Id.* at 587. The district court thus concluded that Unigard was not deprived of its right to associate in the resolution of the asbestos claims covered under XS–3672 and that Unigard's right to associate in the decision to sign the Wellington Agreement "is not a question which is before the Court." *Id.* We disagree.

The following evidence establishes that payments made by North River to Owens–Corning under XS–3672 were made pursuant to the Wellington Agreement. Owens–Corning terminated the Facility's authority to handle claims asserted against it after October 3, 1987. Owens–Corning itself settled and paid 100% of the claims filed after this date and was therefore no longer subject to the producer-allocation formula. However, the Agreement's insurance-allocation formula continued, as established by the following evidence, which was detailed above: the testimony of North River's witness, Wilke–Murray, who prepared the bills that Owens–Corning sent out to its insurers; the bills and accompanying letters submitted to Unigard; North River's answers to interrogatories; and statements by North River's attorney to the district court. Moreover, Owens–Corning also continued to pay the Facility its producer-allocation share for claims filed before October 3, 1987, and North River reimbursed Owens–Corning under XS–3672 for those claims that were settled by the Facility after February 1989 when coverage under XS–3672 began.

Withdrawal from the Facility was thus not the equivalent of withdrawal from the Wellington Agreement. As explained above, the Facility was the mechanism through which claims were settled, defended, and paid. When Owens–Corning withdrew from the Facility, new claims were no longer subject to the producer-allocation formula. However, even though Owens–Corning was no longer a member of the Facility and was paying its own claims, it still needed to spread those payments to its insurers. Because the coverage rules of the Wellington Agreement were "perpetual," Owens–Corning had to apply the insurance-allocation formula of the Wellington Agreement to spread losses to coverage blocks—including the coverage block containing XS–3672, reinsured by Unigard's Certificate. Additionally, Owens–Corning was still responsible for paying its producer-allocated share of those claims filed with the Facility prior to their withdrawal.

Thus, the Wellington Agreement did affect the claims paid by North River to Owens–Corning pursuant to XS–3672. The coverage principles of the Wellington Agreement were used to compute which insurance companies would pay and how much they would pay for each claim. The district court's findings that the Wellington Agreement did not affect the coverage of XS–3672 and that, therefore, none of the claims billed to Unigard "were paid under the Wellington Agreement," 762 F.Supp. at 587, were clearly erroneous. *See* Fed.R.Civ.P. 52(a).

## B. NOTICE OF THE WELLINGTON AGREEMENT WAS REQUIRED

■ Unigard argues that notice was required by the Certificate when North River signed the Wellington Agreement. Because the district court did not believe payments under XS–3672 were made pursuant to the Wellington Agreement, it did not reach this issue. The district court did, however, hold that the doctrine of utmost good faith did not require North River to give Unigard notice of the signing of the Agreement. We think notice was required by the Certificate and by the good faith doctrine.

Although we have recently stated in dicta that "an ambiguous reinsurance contract is generally construed against the reinsurer," *Christiania General Insurance Corp. v. Great American Insurance Co.,* 979 F.2d 268, 278 (2d Cir.1992), we believe that this canon of construction does not apply in this matter. In answering the certified question, the New York Court of Appeals used an analysis based on "general contract law principle[s]," *Unigard Sec. Ins. Co.,* 79 N.Y.2d at 584, 584 N.Y.S.2d 290, 594 N.E.2d 571, and made no reference whatsoever to such a can-

on of construction. We believe that the Court of Appeals was implicitly recognizing that reinsurance contracts are negotiated at arm's length by two sophisticated parties, *see, e.g., Int'l Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.,* No. 88C320, 1989 WL 165045, at *4, 1989 U.S.Dist. LEXIS 15626, at *11–12 (N.D.Ill. Dec. 29, 1989), and that canons of construction that protect individual purchasers of original insurance policies do not apply to reinsurance. *See In re Pritchard & Baird, Inc.,* 8 B.R. 265, 270–71 (D.N.J. 1980) (consumer protection statute for insurance not applicable to reinsurance); 1 Gerathewohl, *supra,* at 402–12. Indeed, our own caselaw had so held prior to the dicta in *Christiania. See Great American Ins. Co. v. Fireman's Fund Ins. Co.,* 481 F.2d 948, 954 (2d Cir.1973) ("Although ordinarily we would be disposed to interpret the language of an ambiguous notice in favor of the insured and against the insurer, we consider that this general rule should not apply when both insured and insurer are 'large insurance companies long engaged in far flung activities in that field of economic activity.'") (citation omitted); *see also Arkwright–Boston Man. Mut. Ins. Co. v. Calvert Fire Ins. Co.,* 887 F.2d 437, 440 (2d Cir.1989). Indeed, reinsurers are so dependent upon ceding insurers for information, that application of a canon construing the reinsurance contract against the reinsurer would be highly anomalous.

■ We thus examine the notice clause pursuant to a principle of neutral interpretation. Prompt notice provisions in reinsurance are designed to: (i) apprise the reinsurer of potential liabilities to enable it to set reserves, *see Delta Holdings,* 945 F.2d at 1229; (ii) enable the reinsurer to associate in the defense and control of underlying claims; and (iii) assist the reinsurer in determining whether and at what price to renew reinsurance coverage. *See Christiania,* 979 F.2d at 274. The Certificate's notice clause provides: "Prompt notice shall be given by the [ceding insurer] to the Underwriting Managers on behalf of the Reinsurers of any occurrence or accident which appears likely to involve this reinsurance...."

■ In *Christiania,* we stated that an identical notice clause required notice within a reasonable time after the duty to give notice had arisen. *Id.* at 275. Accordingly, a provision that requires notice when it "appears likely to involve th[e] reinsurance," does not require a "probability—much less a certainty—that the policy at issue will be involved.... All that is required is a 'reasonable possibility' of such happening, based on an objective assessment of the information available." *Id.* at 276. Moreover, "[s]uch a possibility may exist even though there are some factors that tend to suggest the opposite." *Id.* Thus, the notice clause requires detailed notice not only to enable the reinsurer to associate but also to set adequate reserves and to fix premiums. *Id.* at 276–77. Finally, "'being an insurance company, the [ceding insurer] is held to a high degree of compliance with policy provisions which require prompt notice to the reinsurer....'" *Id.* at 278 (quoting 19 George J. Couch, *Cyclopedia of Insurance Law* § 80.71 (2d ed. 1983)).

■ North River argues that because the signing of the Agreement was not an "occurrence or accident," no notice was required. However, the "occurrence[s]" and "accident[s]" were the exposures to asbestos, and, if the signing of the Wellington Agreement was an event increasing the likelihood to a "reasonable possibility" that the reinsurance would be involved in compensating claims based on such exposures or "occurrences," then pertinent reinsurers should have been notified.

We think North River was obliged to give notice for two reasons. First, by applying the producer- and insurance-allocation formulae to a vast amount of claims, the signing of the Agreement made involvement of the reinsurance a "reasonable possibility." Multiplying the 40,000 claims pending against the Facility at the time of the signing of the Agreement in 1985, by Owens–Corning's historical average settlement per claim of approximately $10,000, would have yielded an estimated exposure to Owens–Corning of $400,000,000. *See* 762 F.Supp. at 573. In 1985, there was only $337,000,000 in coverage remaining below XS–3672. Moreover, these numbers did not reflect the impact of future unreported claims. Although the district

court was correct in noting that there were other factors to consider, we think that an "objective assessment" of the evidence demonstrates that the signing of the Agreement rendered the likelihood that the reinsurance coverage would be reached a "reasonable possibility." *See Christiania,* 979 F.2d at 276. (Although only the facts available to North River at the time of the signing of the Wellington Agreement are relevant, these calculations understate North River's actual exposure.)

■ The good faith and fair dealing implied in all contracts also required notice. In reinsurance, we have characterized this duty in dicta as one of "utmost good faith." *See Christiania,* 979 F.2d at 278. This view certainly finds support in the caselaw and the literature, although, as noted, some have argued that utmost good faith does not accurately describe the modern relationship of sophisticated insurers bargaining at arms length. *See Unigard,* 762 F.Supp. at 591 (noting that the tradition of utmost good faith had changed due to the "overwhelming pressures" of huge environmental losses like asbestos); Thomas, *supra,* at 1561–62 (using an economic analysis to describe the function and purpose of good faith in the reinsurance market). Nevertheless, because information regarding risks lies with the ceding insurer, the reinsurance market depends upon a high level of good faith to ensure prompt and full disclosure. Absent such disclosure, reinsurers would have to duplicate actuarial and claims-handling efforts of ceding insurers, and reinsurance would become unavailable. Courts should thus adopt information-forcing default rules based on the good faith the reinsurance market demands. *See Restatement (Second) of Contracts* § 205 (1981) (stating that good faith is a flexible standard that can be applied to the circumstances of the case).

■ Applying this standard, whether it be utmost good faith or a lesser duty, notice was required because the signing of the Wellington Agreement substantially altered the terms of the reinsurance certificate. First, based on the insurance-allocation formula, the signing of the Agreement meant that North River would pay some claims for which it was not liable and would pay amounts not proportional to its contracted liabilities on others. This is not to say, however, that those payments would not be offset by North River's not paying claims or proportions of claims for which it was liable. Second, although the Certificate gave Unigard the right to associate in the defense and settlement of claims, the Agreement provided that the Facility would be the "sole agent" and have "*exclusive* authority and discretion to administer, evaluate, settle, pay or defend all asbestos-related claims." (emphasis in original). Where a party to a reinsurance contract signs another agreement that materially alters the terms of the former as demonstrated above, notice is required by even a minimal level of good faith.

## C. NORTH RIVER DID NOT GIVE NOTICE OF THE SIGNING OF THE WELLINGTON AGREEMENT

■ North River argues that it gave adequate notice to Unigard of its signing of the Wellington Agreement. In discussing notice of the Wellington Agreement in terms of good faith, the district court stated that "North River's and Crum & Forster's various communications to Unigard concerning the Agreement cannot be held to have constituted adequate notice relating to the Certificate...." 762 F.Supp. at 588. We agree.

North River relies primarily on the Crum & Forster telex of July 18, 1984. However, that telex referenced only "General Casualty, Comprehensive Catastrophe and Casualty Contingency Reinsurance *Treaties.*" (emphasis added). It made no mention of *facultative* certificates. It was addressed to Killen, who worked in the the RAD, which handled only treaties. Although Killen, while working in the RAD from 1976 until March 1980, had, according to Todd, "related to the [AMAI] function" as "a person to whom certain types of coverage questions and background information on the writing of [AMAI] contracts would be addressed," he had not done so for four years. North River is correct in arguing that Unigard never notified North River of such a change. However, we cannot infer, contrary to the plain language of the telex, that it was meant to

include the Certificate from the fact that Killen once "related to the [AMAI] function" while he also handled treaties.

Unigard's actions on receipt of the telex were consistent with the understanding that it applied only to treaties. The telex went to Van Ditto in the RAD, the unit that handled treaties. Dinsmore, a treaty specialist, determined the numbers of the Unigard treaties to which the telex applied, and Van Ditto then forwarded the telex to CalRe, to whom Unigard had retroceded those treaties. Moreover, other Crum & Forster subsidiaries did not rely on this telex as notice regarding treaties not included in "General Casualty, Comprehensive Catastrophe and Casualty Contingency Reinsurance Treaties." For example, Industrial Indemnity's letter to Unigard referenced "Workers' Compensation and Liability Excess of Loss Reinsurance Treaties."

North River also points to Murphy's October 9, 1984 letter to Todd on behalf of L.W. Biegler, Inc., another subsidiary of Crum & Forster, which underwrote policies for Crum & Forster subsidiaries, including XS–3672 for North River. The letter referenced "the captioned agreement" several times. However, no captioned agreement appeared on the letter, and North River introduced no evidence concerning what "the captioned agreement" was. The letter was addressed to Todd, who worked in the RAD and handled only treaty reinsurance. Todd answered the letter on January 15, 1985, and testified at his deposition that he answered only letters that concerned treaty reinsurance. Moreover, the context of Todd's letter's reference to the AMAI facultative reinsurance suggests that he was not replying to an inquiry concerning that facultative business.

■ The district court did state that the "Killen Telex and Murphy's October 1984 letter to [Todd] contained enough information for Unigard to have discovered the salient facts through its own investigation." 762 F.Supp. at 588. Perhaps, but these letters did not create a burden on Unigard to conduct such an investigation. Not only did neither of these letters contain any reference to the Certificate, but they also did not refer-

ence any facultative reinsurance. Indeed, one did not identify the ceding insurer, North River. To hold that such letters created a duty on the part of Unigard to investigate the Wellington Agreement to determine whether North River was involved, and specifically whether XS–3672 would be affected, would ignore the imperatives of the reinsurance market that reinsurers receive such information from ceding insurers. The burden of giving effective notice is thus on the party who can meet that burden at the least cost—the ceding insurer.

■ Finally, North River relies upon Todd's memo to Palmerton as evidence that Unigard "deliberately elected to ignore the telex in order to maximize its freedom of action later, if and when a reinsurance claim materialized." However, Unigard's actions belie this claim. Unigard responded to several inquiries from ceding insurers regarding Unigard's position on their joining the Wellington Agreement, including several subsidiaries of Crum & Forster. Moreover, there is no evidence that Todd's superiors adopted his suggested position. Finally, Todd had responsibility only for Unigard treaties, and thus had no say in Unigard's managing of facultative certificates.

## D. UNIGARD HAS NOT SHOWN PREJUDICE

■ The sparse reinsurance caselaw is divided on what constitutes prejudice to a reinsurer. Most courts have examined the prejudice requirement in the context of the reinsurer's loss of the bargained-for right to associate in the handling of claims. The Certificate contained such a claims association clause, set out above, which states in pertinent part:

[W]hile the Underwriting Managers or the Reinsurers do not undertake to investigate or defend claims or suits, the Underwriting Managers, directly, or through its representatives and/or counsel, shall nevertheless have the right and be given the opportunity to associate with the Company and its representatives at the Reinsurers' expense in the defense and control of any claim, suit or proceeding which may in-

volve this reinsurance with the full cooperation of the Company.

Some courts have held that the reinsurer must demonstrate that it would have "associated" in the defense if given proper notice and that this association would have resulted in a more favorable ruling. *See Fortress Re, Inc. v. Central Nat'l Ins. Co.,* 766 F.2d 163, 166–67 (4th Cir.1985). Other courts have gone even further, holding that the reinsurer must demonstrate that there was a substantial likelihood that it could have either defeated the underlying claim against its insured or settled the case for a smaller sum. *See Insurance Co. of Pa. v. Associated Int'l Ins. Co.,* 922 F.2d 516, 524–25 (9th Cir.1990) (applying the law of original insurance).

However, *Keehn v. Excess Ins. Co. of America,* 129 F.2d 503 (7th Cir.1942) (applying Illinois law) held that the right to associate "was provided by the terms of the contract and we are of the view that the deprivation of such right would constitute prejudice without any actual proof that the results of the litigation would have been different." *Id.* at 505; *see also Stuyvesant Ins. Co. v. United Public Ins. Co.,* 139 Ind.App. 533, 221 N.E.2d 358, 362 (1966) (holding that an eight month delay amounted to a failure to give reasonable notice under the reinsurance contract and prejudiced the reinsurer's right to assist and negotiate a fair settlement); *Jefferson Ins. Co. v. Fortress Re, Inc.,* 616 F.Supp. 874, 878 (S.D.N.Y.1984) (reading the notice provision to require that the reinsurer "be given an opportunity to participate in the defense of the action"); *Highlands Ins. Co. v. Employers' Surplus Lines,* 497 F.Supp. 169, 173 n. 3 (E.D.La.1980) (stating that the purpose of the notice provision is "to afford a company which may ultimately be liable on a claim the opportunity to participate in the defense of that claim").

It cannot be disputed that Unigard lost any opportunity to associate in the defense of claims as a result of the signing of the Wellington Agreement. As demonstrated above, some payments under XS–3672 were made to Owens–Corning to reimburse it for claims settled by the Facility. Unigard could not associate in the settlements of these claims because the Agreement provided that the Facility is the "sole agent" with "*exclusive* authority" to defend or settle claims. (emphasis in original).

Moreover, by changing the coverage rules pursuant to the insurance-allocation formula, the Agreement altered North River's liabilities, including requiring it to pay some claims and administrative costs for which it was not liable under the original policies. Nonetheless, because the reinsurer's and ceding insurer's interests are essentially the same as to liability, good faith coverage decisions generally do not constitute prejudice. This is so even in the radical case of the Wellington Agreement, which used automatic formulae to replace individualized determinations as to the liability of insureds and their insurers. Coverage and liability would be altered but the changes might offset each other and the total payouts by particular insurers might remain roughly the same.

Adhesion to the Wellington Agreement would likely reduce defense and administrative costs. However, those costs are not covered by the reinsurance contract, and the ceding insurer's and reinsurer's interests obviously diverge. It may thus have been in the ceding insurer's interest to join the Wellington Agreement while the reinsurer may have preferred individualized determinations. Here, North River reinsured XS–3672 100%. Accordingly, it would be reimbursed for all liability payouts. However, it would have to bear all administrative costs. North River's incentive was thus to conserve on administrative costs, not liability.

Nevertheless, the Court of Appeals' opinion on the certified question makes it clear that Unigard must show more than the loss of the right to associate to meet the prejudice standard. The court expressly recognized that loss of the right to associate in the defense of claims may result from late notice from the reinsured but concluded that that risk is not "sufficiently grave to warrant applying a presumption of prejudice." *Unigard Sec. Ins. Co.,* 79 N.Y.2d at 584, 584 N.Y.S.2d 290, 594 N.E.2d 571. We cannot, therefore, follow those cases that hold that the loss of the right to associate itself "constitute[s] prejudice without any actual proof

that the results of the litigation would have been different." *Keehn,* 129 F.2d at 505. Moreover, the court indicated that "concededly no prejudice has been shown." *Unigard Sec. Ins. Co.,* 79 N.Y.2d at 579, 584 N.Y.S.2d 290, 594 N.E.2d 571. Because Unigard concedes only that it cannot show an economic loss while arguing that its lost right to associate constitutes the requisite prejudice, the court's remark clearly indicates that its view of the requisite prejudice is limited to economic injury.

Unigard thus bears the burden of showing that it suffered tangible economic injury because North River failed to give timely notice of the signing of the Wellington Agreement. Because its only claim of injury is based solely on the claim that the loss of contractual rights is prejudicial in and of itself, it has not met that standard.

## E. DID NORTH RIVER ACT IN BAD FAITH?

■ In *Christiania,* which was decided after the New York Court of Appeals' decision in the instant matter, we stated that "a [ceding insurer's] failure to provide prompt notice may entitle the reinsurer to relief without showing prejudice if the [ceding insurer] acted in bad faith." 979 F.2d at 281.

■ As discussed above, the duty of good faith requires the ceding insurer to place the reinsurer " 'in the same [situation] as himself [and] to give to him the same means and opportunity of judging ... the value of the risks.' " *Id.* at 280 (quoting *Sun Mut. Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 510, 1 S.Ct. 582, 600, 27 L.Ed. 337 (1883)). Also as stated above, some commentators have difficulty characterizing contemporary reinsurance contracts as being of utmost good faith. Nevertheless, because information concerning the underlying risk lies virtually in the exclusive possession of the ceding insurer, a very high level of good faith—whether or not designated "utmost"—is required to ensure prompt and full disclosure of material information without causing reinsurers to engage in duplicative monitoring. *See Restatement (Second) of Contracts* § 205 (1981) (stating that good faith is a flexible standard that can be applied to the circumstances of the case).

The question, then, is what good faith requires of a ceding insurer in the notice context.

The district court stated that "North River might have violated the duty of utmost good faith if it inadvertently failed to disclose material information to its reinsurer." *Id.* at 588 (citing *Hare & Chase, Inc. v. National Surety Co.,* 60 F.2d 909, 912 (2d Cir.1932)). The district court did not find such an inadvertent failure because it concluded that "[a]s a matter of both fact and law, the risk was not materially altered by the Wellington Agreement." *Id.*

■ We disagree, however, for reasons stated above, and hold that notice of the signing of the Wellington Agreement was required. However, we do not think simple negligence in not disclosing a material fact constitutes bad faith. First, *Hare & Chase,* cited by the district court, was not a reinsurance case. Second, although courts should adopt information-forcing default rules in the reinsurance context, the adoption of a negligence standard would negate the prejudice requirement established by the Court of Appeals' decision. Virtually every material non-disclosure will be the result of at least negligence, and, if bad faith and negligence are equated, no showing of prejudice would ever be required.

■ We thus think that the proper minimum standard for bad faith should be gross negligence or recklessness. If a ceding insurer deliberately deceives a reinsurer, that deception is of course bad faith. However, if a ceding insurer has implemented routine practices and controls to ensure notification to reinsurers but inadvertence causes a lapse, the insurer has not acted in bad faith. But if a ceding insurer does not implement such practices and controls, then it has willfully disregarded the risk to reinsurers and is guilty of gross negligence. A reinsurer, dependent on its ceding insurer for information, should be able to expect at least this level of protection, and, if a ceding insurer fails to provide it, the reinsurer's late loss notice defense should succeed.

We hold that North River did not act in bad faith. Nothing in the record supports a

finding that North River intentionally deceived Unigard. *See* 762 F.Supp. at 588.

■ Nor does the record support a finding that North River's failure to notify Unigard was more than simple negligence. The Bondy memo demonstrates that as early as 1982 Crum & Forster was considering how to best manage asbestos claims, including reporting to reinsurers. Crum & Forster had established the ECU specifically to manage environmental risks for all Crum & Forster's insurance affiliates, including North River. *See* 762 F.Supp. at 573. The district court found that "[o]ne of the ECU's primary tasks was to monitor and deal with the growing number of asbestos claims." *Id.* Although a centralized reporting group was suggested, the decision to leave the profit centers responsible for reporting notice of loss was not an unreasonable decision. The centers were responsible for recovering from their reinsurers and thus had an incentive to see that timely notices went out. Heap also formed the ECCG to help develop a coordinated and coherent policy of dealing with asbestos claims and to serve as a clearing house for information and ideas.

The ECU carried out its function. In July of 1984, the ECU produced the Status Report on Asbestos–Related Claims which attempted to calculate Crum & Forster's exposure on asbestos claims, including North River's excess certificates underwritten by Biegler. Crum & Forster also produced an "Account Review and Analysis of Impact Upon Crum and Forster" for Owens–Corning under the heading "Asbestos Claim Facility, Wellington Agreement, Coverage Reconciliation."

Heap directed that reinsurers be contacted regarding their views on Crum & Forster signing the Wellington Agreement. Sweeney's letter to Crum & Forster's reinsurance intermediaries asked them to contact its reinsurers "who have participated over the years on our General Casualty, Comprehensive Catastrophe and Casualty Contingency reinsurance treaties." There is no evidence in the record to explain why the facultative certificates were excluded from this inquiry. Heap's memo of June 21 recognized the difference between certificates and treaties,

stating that "[i]t was always understood that reinsurance recoveries for facility claim payments would be subject to the terms and conditions of the treaty or certificate language...." One can speculate that because Crum & Forster had not written facultative reinsurance since the early 1970's and because the management of the facultative claims only required one person and a secretary, that the facultative coverage was overlooked. However, that is just speculation. Whatever the reason, we conclude that the failure to specify facultative certificates was, at worst, simple negligence.

Because we also find no intent to deceive Unigard, we conclude that North River did not act in bad faith in failing to give Unigard notice of the signing of the Wellington Agreement.

## F. UNIGARD IS NOT LIABLE FOR EXPENSES THAT EXCEED THE LIMITS OF LIABILITY OF THE CERTIFICATE

■ *Bellefonte Reinsurance Co. v. Aetna Cas. & Surety Co.*, 903 F.2d 910 (2d Cir. 1990), held that a virtually identical follow the fortunes clause did not "override the limitation on liability" and that therefore the reinsurer was not liable for expenses in excess of the liability limit. *Id.* at 913. The court reasoned that follow the fortunes clauses "coexist with, rather than supplant, the liability cap. To construe the certificates otherwise would effectively eliminate the limitation on the reinsurers' liability to the stated amounts." *Id.*

North River argues, however, that the "follow the form clause" was not considered in *Bellefonte* and that it requires Unigard to pay expenses in excess of the policy limit. North River also argues that unlike the ceding insurer in *Bellefonte* that paid expenses in excess of the policy limits pursuant to a settlement agreement, in the instant case a binding arbitration ordered North River to pay expenses to its insured.

■ The follow the form clause states that the liability of the reinsurers, "*except as otherwise provided by this Certificate,* shall be subject in all respects to all the terms and

conditions of [XS–3672]." (emphasis added). The Certificate otherwise provides for the policy limits. Provision 1 of the Certificate, like the certificate in *Bellefonte,* provides that Unigard agreed to reinsure North River "in consideration of the payment of the reinsurance premium and subject to the terms, conditions, *limits of liability,* and Certificate provisions set forth herein." (emphasis added). In *Bellefonte,* we stated, "the limitation on liability provision capped the reinsurers' liability under the [Certificate]. All other contractual language must be construed in light of that cap." *Id.* at 914. The fact that North River was compelled by arbitration to pay the disputed expenses does not alter the terms of the bargained-for agreement.

▬▬ Finally, North River argues that Unigard expected to pay expenses under the Certificate, as demonstrated by past practices. However, *Bellefonte*'s gloss upon the written agreement is conclusive. The efficiency of the reinsurance industry would not be enhanced by giving different meanings to identical standard contract provisions depending upon idiosyncratic factors in particular lawsuits. The meaning of such provisions is not an issue of fact to be litigated anew each time a dispute goes to court. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2nd Cir.1982) (boilerplate provisions in an indenture are not the consequence of relationship of parties to the indenture and their meaning is therefore a matter of law, not fact).

Accordingly, Unigard is not liable for expenses beyond the stated liability limit in the Certificate.

## CONCLUSION

We affirm in part on the ground that Unigard has not shown that it suffered prejudice from the late notice of the signing of the Wellington Agreement. We reverse in part on the ground that Unigard is not liable for expenses in excess of the policy limits.