**ALLENDALE MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**EXCESS INSURANCE COMPANY, LTD., et al., Defendants.**

**No. 95 Civ. 10970(SAS).**

United States District Court, S.D. New York.

July 8, 1997.

Bernard London, James L. Fischer, James Walsh, London & Fischer, New York City, for Plaintiff.

Richard A. Walker, Jeffrey E. Margulis, Kaplan, Begy & Von Ohlen, Chicago, IL, Robert J. Brown, Chalos & Brown, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

This law suit, brought under diversity jurisdiction, rises from the ashes of a fire that destroyed a warehouse in Seclin, France during the summer of 1991. Plaintiff Allendale Mutual Insurance Company ("Allendale") seeks to recover $7,000,000 in unpaid reinsurance, $5,000,000 in "loss adjustment expenses" and interest, and an unspecified amount for legal fees and expenses incurred in the defense of a prior action for declaratory relief brought by defendants against Allendale in England. Defendants, all British reinsurers, now move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, defendants' motion is granted in part.

## I. Applicable Legal Standard

A party is entitled to summary judgment when there is "no genuine issue of material fact" and the undisputed facts warrant judg-

---

1. To be more precise, defendants move for either partial judgment on the pleadings pursuant to Rule 12(c), or in the alternative partial summary judgment pursuant to Rule 56. Rule 12(c) expressly provides that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Because the parties have submitted various affidavits and documents along with their pleadings, and because I have not excluded those materials from my determination of defendants' motions, those motions are most appropriately treated as Rule 56 motions for summary judgment.

ment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of a material factual dispute rests on the moving party. *See Gallo v. Prudential Residential Svcs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994). Once that burden is met, the non–moving party must present "significant probative supporting evidence" that a factual dispute exists. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

The court's role is not to try issues of fact, but rather to determine whether issues exist to be tried. *See Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir. 1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Donahue,* 834 F.2d at 57, 60. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non–moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

## II. Factual and Procedural Background

The following facts are not in dispute. In December of 1990, Allendale insured the contents of a warehouse leased to Bull Data Systems ("Bull Data") in Seclin, France. This policy was replaced on January 1, 1991, by a policy issued by FM Insurance Company Ltd. ("FMI"), an insurer partially–owned and entirely controlled by Allendale (the "direct insurance policy"). Allendale then reinsured 100% of FMI's policy.[2] The limit of FMI's liability—and Allendale's—under these policies was $48,000,000.

In turn, Allendale arranged for the placement of facultative reinsurance[3] of 100% of the fronting cession. The disputes in this case relate to Allendale's reinsurance agreement with defendants in the amount of $7,000,000 for the portion of the reinsurance layer between $25,000,000 and $38,500,000.[4] The reinsurance agreement was initially issued on January 1, 1991, and was renewed for the year commencing June 1, 1991. In pertinent part, the reinsurance agreement stated as follows:

\* \* \*

| | |
|---|---|
| REASSURED: | ALLENDALE INSURANCE COMPANY |
| ASSURED: | BULL DATA CORPORATION and/or as original. |
| PERIOD: | Twelve months at 1st June, 1991 and/or as original. Both days inclusive. |
| LOCATIONS: | Bull Data Corporation, Seclin, France as original. |
| INTEREST: | Goods and/or Merchandise incidental to the Assured's business consisting principally of personal computers and/or as original. |
| LIMIT: | US$ 7,000,000 any one occurrence p/o US$13,500,000 any one |

**2.** This type of arrangement, in which a licensed insurer issues a policy with the understanding that another party will insure it, is called a "fronting cession". *See, e.g., Union Sav. Am. Life Ins. Co. v. North Cent. Life Ins., Co.,* 813 F.Supp. 481, 484 (S.D.Miss.1993) ("A fronting arrangement is a reinsurance device used by a company, not qualified or licensed to do business in a particular state, to profit from the sale of insurance in that state"). *See generally* Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes* ("Ostrager & Newman") 645 (7th ed.1994). To distinguish Allendale's reinsurance agreement with FMI from the direct insurance policy that FMI issued to Bull Data, I will refer to the former as the "fronting cession".

**3.** There are two basic types of reinsurance policies, facultative and treaty. "In facultative reinsurance, a ceding insurer purchases reinsurance for a part, or all, of a single insurance policy. Treaty reinsurance covers specified classes of a ceding insurer's policies." *Unigard Security Ins., Co. v. North River Ins. Co.,* 4 F.3d 1049, 1053–54 (2d Cir.1993) (citing 1 Klaus Gerathewohl, *Reinsurance Principles and Practice* 64–128 (1980)). *See also* Charles F. Corcoran III, *Reinsurance Litigation: A Primer,* 16 W. New Eng. L.Rev. 41, 43–44 (1994).

**4.** Because defendants reinsured Allendale, which in turn had reinsured FMI, defendants are not technically "reinsurers" as that term is generally used in the nomenclature of the reinsurance industry. Rather, defendants are "retrocessionaires"—the reinsurers of a reinsurer. *See* Ostrager & Newman at 643. However, the parties have consistently referred to Allendale as the insurer and defendants as the reinsurers, and to avoid confusion I shall adhere to these terms throughout this Opinion.

occurrence excess of US$ 25,-000,000 any one occurrence.

CONDITIONS: As original and subject to the same valuation, clauses and conditions as contained in the original policy or policies but only to cover risks of All Risks of Physical Loss or Damage but excluding Inventory Shortage.

Including Strikes, Riots, Civil Commotions and Malicious Damage risks and as original. Premium payable as in original.

Reinsurers agree to follow the settlements of the Reassured in all respects and to bear their proportion of any expenses incurred, whether legal or otherwise, in the investigation and defense of any claim hereunder. Service of Suit Clause (U.S.A.). Insolvency Clause.

\* \* \*

Affidavit of Bernard London, Counsel for Plaintiff ("London Aff."), dated May 5, 1997, Ex. E (emphasis added).[5]

In June of 1991, a fire completely destroyed Bull Data's warehouse. When Bull Data subsequently presented a claim to FMI and Allendale, they refused payment on the grounds that the fire was the result of arson. Bull Data and its affiliates commenced an action before the courts of France to recover under the direct insurance policies (the "French action"). Allendale and FMI also commenced an action against Bull Data in the United States District Court for the Northern District of Illinois. Specifically, defendants sought a declaration that they were not liable to the insured (the "Illinois action"). Ultimately, Allendale agreed to pay Bull Data's claim up to the limits of the direct insurance policies plus interest thereon.

5. The "US$ 7,000,000 any one occurrence [part of] US$ 13,500,000 excess of US$ 25,000,000 per occurrence" indicates that the reinsurers agreed to indemnify Allendale for $7 million of the reinsurance layer between $25 million and $38.5 million. See Defendants' Rule 3(g) Statement of Uncontested Facts ("Defendants' 3(g) Statement") at 3 n. 1; Plaintiff's Response to Defendants' 3(g) Statement ("Plaintiff's 3(g) Response") at ¶ 8.

6. During the appellate stage of the UK action, Allendale commenced an action against defendants in the U.S. District Court of Rhode Island. However, Allendale discontinued the Rhode Is-

After Allendale agreed to pay Bull Data, it put its reinsurers on notice and requested that the reinsurers make payment. In March of 1992, before any other lawsuit between Allendale and defendants had been filed or served in the United States or elsewhere, defendants commenced an action against Allendale in the Commercial Court of the High Court of Justice, Queen's Bench Division (the "UK action"), seeking a declaration that they were not liable to Allendale under the reinsurance agreement on the grounds that Allendale's alleged misrepresentations and non-disclosures had rendered the reinsurance agreement void *ab initio*. The UK action was eventually dismissed on appeal for lack of jurisdiction.[6]

Allendale commenced this action on December 28, 1995 against defendants to recover $7,000,000 in allegedly unpaid reinsurance, an additional $5,000,000 for defendants' alleged proportionate share[7] of "loss adjustment expenses" incurred in the course of the French and Illinois actions, and unspecified damages arising from defendants' alleged breach of the "service of suit" clause in the reinsurance contract inflicted by pursuing the UK action.

## III. Discussion

### A. Allendale's Claim for Loss Adjustment Expenses in Excess of $7,000,000

■ Turning now to the substance of defendants' motion, I address first their argument that Allendale's claim for $5,000,000 in loss adjustment expenses is precluded by the reinsurance agreement, or more precisely by two clauses of that contract. The first

land action by stipulation and subsequently commenced this action in the Southern District of New York.

7. Defendants are the reinsurers for only one layer of the reinsurance of the fronting cession. The other reinsurers have apparently reimbursed Allendale. See Plaintiff's Memo at 1. Thus, although defendants have not raised the issue, I note that it is unclear why defendants alone—and not all the reinsurers—are to be liable for their proportionate share of $5,000,000—unless plaintiff intends to say that each defendant is liable for its share of the defendant reinsurers' collective proportion of the entire $5,000,000.

clause, which I shall refer to as the "limit clause", states:

> LIMIT: US$ 7,000,000 any one occurrence p/o US$13,500,000 any one occurrence excess of US$ 25,000,000 any one occurrence.

London Aff., Ex. E. The second clause, which I shall refer to as the "follow–the–settlement" clause, states:

> Reinsurers agree to follow the settlements of the Reassured in all respects and to bear their proportion of any expenses incurred, whether legal or otherwise, in the investigation and defense of any claim hereunder.

*Id.*

Defendants argue that Allendale cannot recover both on its claim for $7,000,000 in unpaid reinsurance and on its claim for $5,000,000 in loss adjustment expenses because the limit clause caps their liability at $7,000,000 inclusive of all costs and expenses. Allendale, in turn, contends the follow–the–settlement clause required the reinsurers to indemnify it for their proportion of expenses and litigation costs even if those expenses and costs exceeded the $7,000,000 cap. The viability of Allendale's loss adjustment expenses claim therefore turns on a single legal question: can the follow–the–settlement clause serve as a basis for Allendale to recover expenses and costs in excess of the stated limit of $7,000,000?

 I begin the analysis of this question with a recitation of certain contract law fundamentals. "The cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is that the intentions of the parties should control." *Newmont Mines Limited v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir.1986). *See also Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909–10 (1973) (same). To determine the parties' intent, the contract must be read as a whole, and all its clauses must be considered together to determine if and to what extent one may modify, explain or limit another. From this, it follows that a contract containing two clauses which may be in conflict should, if possible, be read to give meaning to both rather than to prefer one to

the exclusion of the other. This is especially true when interpreting contracts drafted by sophisticated and experienced entities, for such are not likely to inadvertently write meaningless, contradictory or vestigial language into a contract. See Restatement (Second) of Contracts § 203(a) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect"); *Id.* cmt. b ("[s]ince an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous").

This being so, Allendale's arguments regarding the plain meaning of the reinsurance agreement face an uphill battle. The reinsurance agreement expressly states: *"LIMIT: US$ 7,000,000"*. The follow–the–settlement clause then follows under the section of the document entitled *"CONDITIONS"*. As stated above, it is a generally accepted principle of contract law that parties will be presumed to intend each clause of a contract to have meaning, rather then to intend one clause to overwrite another. Knowing this, had the parties intended the latter clause to supersede the former under any circumstances (as Allendale now contends the follow–the–settlement clause was intended to trump the limit clause), a standard term of art inserted directly before the follow–the–settlement clause such as "notwithstanding any provision in this contract to the contrary" would have served this purpose. Instead, there is nothing in the contract to indicate that the limit clause does not also apply to claims for expenses and costs. I therefore reject Allendale's argument that the plain meaning of the limit clause is to limit the reinsurers' liability exclusive of Allendale's costs and expenses.

Rather, a straight–forward reading of the contract as a whole requires the opposite conclusion. The limitation clause comes before any other substantive provision of the reinsurance agreement, and the word "LIMIT" is both underlined and set apart physically from the following. "CONDITIONS". The term "LIMIT" is not expressly conditioned by another term in any way. Given the absence of any indication that any clause

in the contract modified the words *"LIMIT:* $US 7,000,000", the most reasonable construction of the contract's language supports defendants' position that the limit clause imposes an absolute cap on their liability at $7,000,000 *in toto.*

This reading of the reinsurance agreement is buttressed by an understanding of the traditional role of follow–the–settlement clauses in the reinsurance industry. Such clauses generally reinforce what has been until recently the general practice in this industry—that is, for reinsurers to conduct their business with insurers on a handshake basis, without second-guessing the insurer's decision to pay a claim.[8] Their purpose is to "preclude wasteful relitigation by a reinsurer of defenses to underlying policy coverage in cases where the ceding insurer has in good faith paid a settlement or judgment." Ostrager & Newman § 16.01 at 658 (citing cases). Follow–the–settlement clauses have not traditionally served to modify or eliminate the limit of the reinsurer's exposure.

Finally, Allendale's arguments face the additional obstacle raised by two directly relevant Second Circuit cases decided within the last seven years, *Bellefonte Reinsurance Co. v. Aetna,* 903 F.2d 910 (2d Cir.1990) and *Unigard Security Ins. Co. v. North River Ins. Co.,* 4 F.3d 1049 (2d Cir.1993). Both cases rejected ceding insurers' claims that a "follow–the–settlement" clause required the reinsurers to pay for defense costs in addition to the reinsurers' express reinsurance limit. The primary ground for these holdings was the court's finding that the insurers' proposed interpretation effectively read the limit clauses out of the reinsurance contracts. *Bellefonte* explained:

> To read the reinsurance [contract] in this case as [the insurer] suggests—allowing the "follow the fortunes"[9] clause to over-

ride the limitation on liability—would strip the limitation clause and other conditions of all meaning; the reinsurer would be obliged merely to reimburse the insurer for any and all funds paid.... The "follow the fortunes" clauses in the [contracts] are structured so that they co–exist with, rather than supplant, the liability cap.

*Bellefonte,* 903 F.2d at 913. In addition, *Bellefonte* relied on the express language of the contract at issue in that case, pointing out that the insurer's suggested interpretation "would negate the phrase 'the reinsurer does hereby reinsure Aetna ... *subject to the ... amount of the liability set forth herein'* " and concluding based on that language that "[t]he reinsurers are liable only to the extent of the risk they agreed to reinsure." *Id.* at 914.

*Unigard* underscored the Second Circuit's interpretation of the effect of follow–the–settlement clauses on limit clauses in reinsurance contracts. Holding that the contract in dispute was "virtually identical" to the *Bellefonte* contract, the court wrote:

> The efficacy of the reinsurance industry would not be enhanced by giving different meanings to identical standard contract provisions depending on idiosyncratic factors in particular lawsuits. The meaning of such provisions is not an issue of fact to be litigated anew each time a dispute goes to court.

*Unigard,* 4 F.3d at 1071. As in *Bellefonte,* the limitation on liability provision was interpreted as a cap on the reinsurers' liability; the court then ruled that "[a]ll other contractual language must be construed in light of that cap." *Id.*

In reaching its conclusion that the reinsurer was not liable for expenses beyond the stated liability limit in the contract, the *Uni-*

---

**8.** There is a common–sense explanation for the traditionally amicable relationship between insurers and reinsurers. Reinsurers are, of necessity, paid smaller premiums than insurers, and thus cannot afford "to duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims." *Unigard,* 4 F.3d at 1054. Nevertheless, they may generally rely on the good faith of the insurers because "repeat transactions are the norm, [and] reputation is thus important to commercial success and

the loss of repeat business is a penalty that usually outweighs the short-term gains of misrepresentations or stonewalling contractual obligations." *Id.*

**9.** For the purposes of understanding *Bellefonte,* there is no distinction between "follow–the–fortunes" clauses and "follow–the–settlement" clauses. *See* Ostrager & Newman § 16.01 at 657.

*gard* court also relied on the contractual terms themselves, which stated that the obligation of the reinsurers to follow the settlement of the insurer, *"except as otherwise provided by this [Contract],* shall be subject in all respects to all the terms and conditions of [the reinsurance agreement]." *Id.* at 1070–71. It was clear, the Court ruled, that the contract "otherwise provided" for the policy limit; thus the follow–the–settlement clause was to be construed in light of that limit. *Id.* at 1071.

Allendale attempts to distinguish *Bellefonte* and *Unigard* by arguing that the holdings in both cases were based entirely on the *"subject to"* or *"except as otherwise provided"* language discussed above, whereas the reinsurance agreement in dispute here lacks any such terms. It is true that both holdings relied in part on express contractual terms that unambiguously indicated the reinsurers' obligations to follow the insured's settlement was "subject to" the limit clause. However, the primary underpinning of both cases is the parties' assumed intent to give meaning to both the limit clause and the follow–the–fortunes clause. To fulfill this intent, the reinsurers' duty to follow the settlement must be understood to be capped by the limit clause. "To construe the [contracts] otherwise would effectively eliminate the limitation on the reinsurer's liability to the stated amounts." *Bellefonte,* 903 F.2d at 913.

Allendale also strives to distinguish *Bellefonte* on the basis of specific factual distinctions, such as the fact that Aetna's underlying policy was a "liability policy" placed on a cost-inclusive basis, whereas the insurance policy issued to Bull Data was a "property insurance" policy. Even were I to accept Allendale's claim that "[l]iability policies are conceptually distinct from the property insurance policy issued to Bull Data in the case at bar", this is a distinction without a difference.[10] *See* Plaintiff's Memorandum of Law

in Opposition to Defendants' Motion ("Plaintiff's Memo") at 11, 11 n. 12. These arguments rely on the kind of "idiosyncratic factors" that *Unigard* teaches should not be considered in determining whether a follow-the-settlement clause may extend a reinsurer's liability beyond the stated liability limit, *see Unigard,* 4 F.3d at 1071, and cannot allow Allendale to evade the clear holdings of *Bellefonte* and *Unigard* with regard the effect of a standard follow–the–settlement clause on a limit clause in a reinsurance contract.

While the follow–the–settlement clause requires defendants to accept Allendale's good faith decisions to settle a case, and to pay their proportion of that settlement, it does not increase their potential liability in excess of the risk for which they bargained. As a matter of law, the limit clause must be interpreted to cap the reinsurers' liability to $7,000,000 including all of Allendale's costs and expenses. Hence, the terms of the reinsurance agreement preclude Allendale's claim for loss adjustment expenses in addition to its claim for $7,000,000 in unpaid reinsurance.

### B. Allendale's Claim for Breach of the Service of Suit Clause

Defendants have also moved for summary judgment on Allendale's claim for breach of the service–of–suit clause, which reads in pertinent part:

> It is agreed that in the event of the failure of the Underwriters severally subscribing to this insurance (the Underwriters) to pay any amount claimed to be due hereunder, the Underwriters, at the request of the Assured, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America.
>
> Notwithstanding any provision elsewhere in this insurance related to jurisdiction, it

---

**10.** Allendale argues that an insurer's liability under a property insurance policy is triggered only when the insured has sustained an actual loss, whereas liability insurance requires an insurer to make payment whenever liability attaches even if the insured has not yet suffered a loss. *See* Plaintiff's Memo at 11 and 11 n. 12. While this may be so, I see no reason why this difference between the two kinds of insurance policies nec-

essarily supports Allendale's assertion that loss adjustment expenses must be considered "separate and apart from the indemnity payment" and thus are not capped by the limit clause. *Id.* at 11 n. 12. As stated above, whether or not Allendale's ability to recover loss adjustment expenses is capped by the limit clause must be determined by looking to the parties' intent as reflected in the language of the contract.

is agreed that the Underwriters have the right to commence an action in any court of competent jurisdiction in the United States of America, and nothing in this clause constitutes or should be understood to constitute a waiver of the Underwriters' right to remove an action to a United States Federal District Court or to seek remand therefrom or to seek a transfer of any suit to any other court of competent jurisdiction as permitted by the laws of the United States of America or any state therein.

*See* Defendants' Memo at 6 n. 9. Defendants rely on two arguments in support of their motion. First, defendants maintain that Allendale is collaterally estopped from litigating this issue as the English Court of Appeals previously decided that defendants did not breach the service–of–suit clause by commencing the UK action. Second, defendants contend that while the service–of–suit clause gave Allendale the right to sue in courts of the United States, the same clause cannot be interpreted give Allendale a breach of contract action based on the reinsurers's decision to pursue the UK action. I will address each argument in turn, for I need not ascertain the proper interpretation of the clause if Allendale is collaterally estopped from bringing its service–of–suit claim.

### 1. Defendants' Collateral Estoppel Argument

█ Allendale does not dispute that the English Court of Appeal, in the course of dismissing the UK action for lack of jurisdiction, stated that defendants did not breach the service–of–suit clause by commencing and maintaining the UK action. *See* Defendants' Index of Exhibits, Ex. F at 11, 12–13 (transcript of English appellate decision). Defendants now contend that this statement collaterally estops Allendale's service–of–suit clause in this action. This argument raises the question of whether and when a decision of law by an English court may preclude subsequent litigation of that issue in a separate action brought in federal court.

█ As this is a diversity action, New York law determines the preclusive effect of the English decision. *See Johnson v. Wat-*

*kins,* 101 F.3d 792, 794 (2d Cir.1996); *Scheiner v. Wallace,* 832 F.Supp. 687, 694 (S.D.N.Y.1993); *Fairchild, Arabatzis & Smith, Inc. v. Prometco,* 470 F.Supp. 610, 614–615 (S.D.N.Y.1979). Under New York law, the final judgments of a foreign court will not be recognized if that court lacked subject matter jurisdiction of the action. *See* N.Y. C.P.L.R. § 5304 (1996) ("A foreign country judgment need not be recognized if . . . the foreign court did not have jurisdiction over the subject matter"). *See also Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986); *Prometco,* 470 F.Supp. at 615 (citing, *inter alia, Johnston v. Compagnie Generale Transatlantique,* 242 N.Y. 381, 384, 152 N.E. 121 (1926)). The reason for this rule is fundamental: "jurisdiction over a case is power to render a binding judgment in it; if there is no jurisdiction, there is no power." *Disher v. Information Resources, Inc.,* 873 F.2d 136, 139 (7th Cir.1989). As stated above, the English Court of Appeals may have determined that defendants did not breach the service–of–suit clause by initiating the UK action, but it also determined that it lacked subject matter jurisdiction over the action. *See* Defendants' Index of Exhibits, Ex. F at 15–16. Accordingly, none of the English court's decisions of law, other than its finding that it lacked jurisdiction, have preclusive effect under New York law. I must therefore turn to the parties' arguments regarding the proper interpretation of the service–of–suit clause.

### 2. Interpretation of the Service–of–Suit Clause

█ maintains that summary judgment is inappropriate because the service–of–suit clause provides them with a viable claim for breach of contract, or in the alternative is ambiguous on this issue. *See* Plaintiff's Memo at 18–19. Defendants argue that the clause, as a matter of law, allowed them to sue in England, thereby prohibiting a breach of contract action based on the UK action. Because I find that the service–of–suit clause may reasonably be interpreted from an objective standpoint to support either party's position, defendants' motion for

summary judgment of Allendale's breach of contract claim is denied.

■■■ The determination of whether a contract provision is ambiguous is a threshold question of law for the court. *See Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263–64 (2d Cir.1987) (citing, *inter alia, Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075 (1982)). As the Court of Appeals has explained,

> [a]n "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id.* at 263 (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968)). Thus, "[a]n ambiguity is present only where each of the competing interpretations is objectively reasonable," and "[c]ourts may not create an ambiguity where none exists." *United National Ins. Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, 107 (2d Cir.1993) and *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 306 (2d Cir.1987).

■■■ Where a court determines that a contractual provision is ambiguous, it is appropriate to refer to extrinsic evidence, including industry custom and practice, to determine the parties' intent. *See Christiania*

*General Ins. Corp. of New York v. Great American Ins. Co.*, 979 F.2d 268, 274 (2d Cir.1992) (citing *London Assurance Corp. v. Thompson*, 170 N.Y. 94, 99, 62 N.E. 1066 (1902)). However, "when resort to extrinsic evidence is necessary to shed light on the parties' intent summary judgment ordinarily is not an appropriate remedy" unless, viewing all the facts in the light most favorable to the non–movant, no reasonable trier of fact could find against the movant. *Id.* at 274 (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428–29 (2d Cir.1992)).[11]

The service–of–suit clause is a standard provision that Lloyd's underwriters have used in insurance and reinsurance contracts for decades. *See Travelers Ins. Co. v. Keeling*, No. 91 Civ. 7753, 1993 WL 18909, at *3 (S.D.N.Y. Jan.19, 1993); *Rokeby–Johnson v. Kentucky Agricultural Energy Corp.*, 108 A.D.2d 336, 489 N.Y.S.2d 69, 74 (1st Dep't 1985); *Appalachian Ins. Co. v. Union Carbide Corp.*, 162 Cal.App.3d 427, 432, 208 Cal. Rptr. 627 (Cal.Ct.App.1984). For almost as long, state and federal courts throughout the nation have struggled to give meaning to this clause, sometimes reaching different conclusions on basic issues such as (1) whether the clause is a type of "forum selection clause"[12]; (2) whether the clause precludes the insurer from making a successful motion for *forum non conveniens* if the insured files an action in a United States court;[13] (3) whether the clause bars the insurer from removing an insured's state court action to federal court;[14] and (4) whether the clause pre-

---

**11.** Neither Allendale nor defendants have presented extrinsic evidence regarding the meaning of the service-of-suit clause, or argued that this motion may be decided by reference to such.

**12.** *Compare Rokeby*, 489 N.Y.S.2d at 71 (clause is a forum selection clause), *overruled by Columbia Cas. Co. v. Bristol–Myers Squibb Co.*, 215 A.D.2d 91, 635 N.Y.S.2d 173, 176 (1st Dep't 1995), *with Price v. Brown Group, Inc.*, 206 A.D.2d 195, 619 N.Y.S.2d 414, 417–418 (4th Dep't 1994) (clause is not a forum selection clause). This issue was recently resolved by the New York Court of Appeals in *Brooke Group Ltd. v. JCH Syndicate 488 et al.*, 87 N.Y.2d 530, 640 N.Y.S.2d 479, 482, 663 N.E.2d 635, 638 (1996) (service-of-suit clause must be distinguished from exclusive forum selection clauses and clause does not therefore preclude insurer's motion for *forum non conveniens*).

**13.** *See, e.g., Appalachian Ins. Co. v. Superior Court*, 162 Cal.App.3d 427, 433–34, 208 Cal.Rptr. 627 (1984) (clause does not preclude successful *forum non conveniens* motion because such motion may be granted based on considerations of public interest alone even if parties agreed on forum).

**14.** *See McDermott Int'l, Inc. v. Lloyds Underwriters*, 944 F.2d 1199, 1204–05 (5th Cir.1991) (service–of–suit clause did not waive reinsurer's right to remove). *But see, e.g., Keeling*, 1993 WL 18909 at *5 (distinguishing *McDermott* and holding clause barred insurer from removing state action to neighboring federal court); *Lavan Petroleum Co. v. Underwriters at Lloyds*, 334 F.Supp. 1069, 1073 (S.D.N.Y.1971) (same); *General Phoenix Corp. v. Malyon*, 88 F.Supp. 502, 503 (S.D.N.Y.1949) (same); *Archdiocese Of Mil-*

cludes an insurer from bringing an action in a United States forum before the insured files its own action.[15] Yet none of the cases cited above squarely address the issue raised by defendants' motion: does Allendale have a viable claim for breach of the service–of–suit clause based on the defendants' continued pursuit of the UK action?

Despite the parties' contentions to the contrary, the answer cannot readily be distilled from the language of the clause. Allendale argues that a plain meaning of the service-of–suit clause shows it was intended to give Allendale the absolute right to sue defendants in a United States court. Defendants, in turn, assert that nothing in the service–of–suit clause expressly barred them from bringing their own action in the forum of their choosing, but that Allendale merely bargained for and obtained the right to sue defendants in a forum which might not otherwise be suitable based on lack of personal jurisdiction. Both interpretations of the service–of–suit clause are feasible.

Defendants' position has appeal, for if Allendale had wished to insert an exclusive forum selection clause into the reinsurance agreement, it surely possessed the sophistication required to draft one.[16] By the same token, if Allendale had wished to bar defendants from bringing an action in England it could have bargained for an express contractual prohibition. Thus, defendants maintain, to interpret the service–of–suit clause as Allendale now advocates would inject an agreement into the contract that would have been reduced to written terms had it existed in the first place.

Defendants cite no binding authority that supports their proposed interpretation of the service-of-suit clause. Rather, they rely on cases that stand for the here–uncontested

proposition that a service–of–suit clause does not convey an absolute right upon the insured to have its claims litigated in the forum of its choosing. *International Ins. Co. v. McDermott, Inc.*, 956 F.2d 93 (5th Cir.1992) and *Employers Mut. Cas. Co. v. Key Pharmaceuticals, Inc.*, 91 Civ. 1630, 1992 WL 8712, at *2–*3 (S.D.N.Y. Jan. 16, 1992) merely held that almost identical service–of–suit clauses were not triggered by "preemptive" actions brought by insurers in a forum permitted by the clause—that is, within the United States. In those cases, the insureds could not and did not claim the insurers had violated the service–of–suit clause because the insurers had not refused to submit to courts of competent jurisdiction within the United States, but rather had merely refused to submit to the exact fora within the United States selected by the insureds.

Defendants also cite *Boutari and Son, Wines & Spirits, S.A. v. Attiki Importers and Distributors, Inc.*, 22 F.3d 51 (2d Cir. 1994) in support of their argument. *Boutari* involved a forum selection clause that stated in pertinent part: "Any dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts. . . ." The Court of Appeals held that the choice of forum was permissive, not mandatory, and therefore reversed the District Court's decision to dismiss the action brought in the Eastern District of New York based on the clause. *See Boutari*, 22 F.3d at 53 ("[w]hen only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive") (citing, *inter alia, Docksider, Ltd. v. Sea Technology, Ltd.*, 875 F.2d 762, 764 (9th Cir.1989)).

The rule of *Boutari* is a narrow one: a forum selection clause conferring jurisdiction

---

waukee v. Underwriters at Lloyd's, 955 F.Supp. 1066, 1071–1072 (E.D.Wis.1997) (same and listing cases with similar holding).

**15.** *Compare Price*, 619 N.Y.S.2d at 418 (clause did not preclude insurer from filing in United States court before insured filed an action) *with Rokeby*, 489 N.Y.S.2d at 74–75 (reaching opposite conclusion).

**16.** For exactly this reason, the case law cited by Allendale regarding the presumptive validity of

exclusive forum selection clauses does not apply in this case. The service–of–suit clause at issue here is substantively different from the forum selection clauses analyzed in cases such as M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), for it does not expressly designate a single forum in which the parties agreed to resolve their dispute. *See Brooke Group Ltd.*, 640 N.Y.S.2d at 482, 663 N.E.2d 635.

in one forum will not be interpreted as intended to exclude jurisdiction elsewhere unless such an intention is clearly expressed by the terms of the contract. *See Boutari*, 22 F.3d at 53. Defendants' arguments based on *Boutari* fail for several reasons. First, the service–of–suit clause at issue here is quite different than the forum selection clause at issue in *Boutari*. Second, Allendale does not claim that the service–of–suit clause gave it the right to choose an exclusive forum in which its dispute with defendants would be litigated. Had defendants chosen to commence their action in or transfer it to—a United States court, Allendale could not have asserted that it had rights under the service–of–suit clause to choose a particular forum in the United States. *See Brooke Group Ltd.*, 640 N.Y.S.2d at 482, 663 N.E.2d at 638. Rather, Allendale claims that the service–of–suit clause obliged defendants to transfer the UK action to a court of the United States once Allendale requested that it do so.

Allendale's position is that the language of the clause indicates its purpose was to give Allendale the unfettered right to sue defendants in the United States. If this is so, Allendale claims, defendants' interpretation does not faithfully effectuate the parties' intent. Allendale's rights under the service–of–suit clause are triggered by the reinsurers' refusal "to pay any amount claimed to be due". Thus, if the service–of–suit clause were to be interpreted as defendants now propose, the reinsurers would have the capacity to delay their refusal to pay Allendale's claims until they filed a declaratory action in England—thus ensuring that Allendale never had an unhindered opportunity to litigate its claim in a court of the United States.[17]

Furthermore, because it gives the reinsurers the ability to frustrate Allendale's right to sue in the United States by bringing a preemptive action in a foreign jurisdiction, defendants' proposed interpretation of the service–of–suit clause would put great pressure on Allendale to sue the reinsurers as soon as they refused to pay a claim. A reasonable mind could certainly conclude that the parties did not intend to create such an unwise incentive to resort to litigation to resolve a dispute under the reinsurance agreement. As New York courts have held before, there should be no penalty for being slow to litigate, nor any advantage for being first to the steps of the courthouse. This well–established principle is particularly compelling with regard to a contract formed between members of an industry that has been traditionally reluctant to bring its disputes into courts of law, preferring instead to resolve them in more expeditious ways.

In addition, defendants' interpretation of the service–of–suit clause would permit the parties to conduct two identical actions, one initiated by defendants in England and a second commenced by Allendale in a United States court. This interpretation of the service–of–suit clause is surely not required absent a clear indication of the parties' intent. For example, in *Karl Koch Erecting Co. v. N.Y. Convention Center Development Corp.*, 838 F.2d 656, 659 (2d Cir.1988), the Court of Appeals held that a forum selection clause that exclusively designated the New York state court [18] barred the insured from removing the insurer's declaratory action to the Southern District of New York. In reaching this conclusion, the court reasoned that the parties' intent could not have been to allow the insured to remove the insurer's declaratory action to a federal court, because the insured's counterclaims would then have to

---

**17.** Technically speaking, Allendale was free to file an action to assert its rights under the reinsurance agreement in a United States court after defendants filed the UK action. The two actions (defendants' UK action and Allendale's United States action) would be mirror images of each other as they would involve identical issues of law and the same parties. Yet these identical actions would not be litigated on even ground. Given that neither federal nor state courts are required to try cases that duplicate the expenditure of time, money and judicial resources, Allen-

dale would face the substantial hurdle of convincing the United States court to try its case during the pendency of the U.K. action. *See, e.g., Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 662–63, 98 S.Ct. 2552, 2557–58, 57 L.Ed.2d 504 (1978); N.Y. C.P.L.R. § 3211(a)(4).

**18.** The clause in question reads: "No action or proceeding shall be commenced by [Koch] against [NYCCDC] except in the Supreme Court of the State of New York." *Id.* at 659.

be filed in state court—thus resulting in bifurcation of the action and defeating the obvious purpose of the clause. *See id.* Read broadly, the holding of *Karl Koch Erecting Co.* teaches that given two interpretations of a jurisdictional clause, one of which could result in piecemeal or duplicitous litigation in different fora, and one of which results in the adjudication of the parties' entire dispute in a single forum, the latter may be presumed to be more faithful to the parties' original intent unless the contract expressly indicates otherwise. This proposition supports Allendale's interpretation of the service–of–suit clause.

The parties have not cited any case that mandates one interpretation of the service–of–suit clause. Read from an objective standpoint, the language of the service–of–suit clause may provide Allendale with a breach of contract action based on defendants' decision to continue a proceeding in a foreign jurisdiction after Allendale asserted its right to litigate the same dispute in a United States court. The ultimate resolution of this question will turn on a finding of the parties' intent, which cannot be said to be evident as a matter of law from the language of the clause itself. Defendants' summary judgment motion to dismiss Allendale's claim for breach of the service–of–suit clause is denied.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted with regard to Allendale's loss adjustment expenses claim and denied with regard to Allendale's breach of service–of–suit claim.

SO ORDERED.