GARCIA, J. (dissenting).
The vehicle involved in the tragic accident underlying this case was not a "hired auto" under settled principles of insurance law (see Dairylea Coop. v. Rossal, 64 N.Y.2d 1, 9-10, 483 N.Y.S.2d 1001, 473 N.E.2d 251 [1984] ; see also Toops v. Gulf Coast Mar. Inc., 72 F.3d 483, 487-488 [5th Cir.1996] ; 8A Steven Plitt et al., Couch on Insurance § 118:49 [3d ed.] ). I would therefore affirm on that basis.
I.
In April 2004, MVP Delivery and Logistics, Inc. entered into a cartage agreement with DHL Express (USA) Inc. to provide package delivery services in the Western New York region. The agreement expressly identified MVP as an independent contractor. As such, MVP owned and registered the vehicles in its delivery fleet. MVP also maintained control over its employees and the manner and means of its performance under the cartage agreement. Pursuant to the terms of the agreement, MVP obtained a $1 million liability insurance policy to cover the vehicles.
***311 On July 7, 2004, an MVP delivery van, driven by employee William Porter, collided head on with another vehicle. The driver of that vehicle died 13 days later as a result of the injuries she sustained in the crash. At the time of the accident, William Porter was running a personal errand on a scheduled break.
In the underlying wrongful death litigation, a jury awarded Michael Carlson, in both his individual capacity and as administrator of his deceased wife's estate, $20 million against William Porter, MVP, and DHL. The Appellate Division reversed the judgment against MVP and DHL, reasoning that MVP and DHL could not be held vicariously liable on a theory of respondeat superior because Porter's employment did not create the need for the travel ( Carlson v. Porter, 53 A.D.3d 1129, 1132, 861 N.Y.S.2d 907 [4th Dept.2008] ). In other words, Porter exceeded the scope of his employment by running a personal errand at the time of the accident. MVP was nonetheless still held statutorily liable as owner of the vehicle (see Vehicle and Traffic Law § 388 ). The Appellate Division also set aside the damages award as excessive and plaintiff stipulated to a reduced judgment of $7.3 million. To date, plaintiff *505 **115 has received approximately $1.1 million from MVP's insurance carrier.
Seeking to satisfy the deficient judgment, plaintiff, in his individual capacity and as administrator of his wife's estate, commenced this action under Insurance Law § 3420(b).[1] Specifically, plaintiff seeks to recover from DHL's insurers on the theory that the MVP vehicle was a "hired auto" within the meaning of DHL's insurance policies. As such, MVP would be an "insured" under those policies.
Three DHL insurance policies are relevant here. First, National Union Fire Insurance Company of Pittsburgh, a subsidiary of American International Group, Inc. (AIG), issued DHL's primary insurance policy in the amount of $3 million. This liability policy contained a "hired auto" provision defining an insured as anyone "using with your permission a covered auto you own, hire or borrow." Second, National Union issued a $23 million umbrella policy defining an insured as "[a]ny person ... or organization with respect to any auto owned by you, loaned to you or hired by you on your behalf and used ***312 with your permission." Under both policies, "you" means a named insured, which explicitly includes DHL but not MVP or any other independent contractor. Third, DHL purchased a $2 million excess policy from American Alternative Insurance Company (AAIC), which followed the form of DHL's primary insurance policy.
These defendant insurance companies moved to dismiss this action under CPLR 3211(a)(1) and (7). Supreme Court, Niagara County denied the motions insofar as the insurers sought dismissal under Insurance Law § 3420. The court rejected AAIC's argument that the excess policy had not been "issued or delivered" in New York, as required by Insurance Law § 3420(a), because the accident took place while the named insured was doing business within the state. After limited discovery, the same court concluded that the pleadings were sufficient to allege that the MVP vehicle constituted a "hired auto" under the relevant policies.
On appeal, the Appellate Division reversed and granted the motion to dismiss, concluding that plaintiff could not state a claim against National Union because DHL did not "hire" the vehicle in question and could not have given MVP permission to use MVP's own vehicle (130 A.D.3d 1479, 1481, 12 N.Y.S.3d 715 [4th Dept.2015] ). As a result, MVP was not an "insured" under the applicable policies. In a companion appeal, the Appellate Division also dismissed the first cause of action against AAIC ( 130 A.D.3d 1477, 1477-1478, 16 N.Y.S.3d 637 [4th Dept.2015] ). The Court reasoned that the excess policy had not been "issued or delivered in this state" as required by Insurance Law § 3420(a)(2). This Court subsequently granted leave to appeal.
II.
The majority holds that whether MVP is an "insured" under DHL's insurance policies presents a question of fact to be resolved by a jury. I disagree. The cartage agreement on its face establishes that MVP is an independent contractor responsible for the purchase, operation, and maintenance of its delivery fleet. As such, MVP exercised meaningful control over its vehicles, thereby precluding "hired auto" coverage, as a matter of law, under the relevant insurance policies.
**116 *506 A.
"The key inquiry regarding whether an automobile will fall within the hired automobiles provision of [a] policy is whether ***313 the insured exercised dominion, control, or the right to direct the use of the vehicle" (8A Steven Plitt et al., Couch on Insurance § 118:49 [3d ed.] ).[2] In other words, the issue is whether the underlying agreement is for the services of the independent contractor or for the vehicle used in providing those services (see id. ; Dairylea Coop. v. Rossal, 64 N.Y.2d 1, 9-10, 483 N.Y.S.2d 1001, 473 N.E.2d 251 [1984] ; Transport Indem. Co. v. Liberty Mut. Ins. Co., 620 F.2d 1368, 1371 [9th Cir.1980] ). A business should not be liable for its independent contractor's use of the vehicles if the business cannot control the manner in which those vehicles operate (see Chainani v. Board of Educ. of City of N.Y., 87 N.Y.2d 370, 380-381, 639 N.Y.S.2d 971, 663 N.E.2d 283 [1995] ; Kleeman v. Rheingold, 81 N.Y.2d 270, 274, 598 N.Y.S.2d 149, 614 N.E.2d 712 [1993] ). That was clearly the case here.
MVP, not DHL, owned the delivery vehicle at issue. Accordingly, to obtain coverage, plaintiff has the burden of establishing that the MVP vehicle was (1) "hired" by DHL and (2) used with DHL's permission at the time of the accident. Here, the 14-page cartage agreement, read in conjunction with the insurance policies, conclusively defeats plaintiff's "hired auto" claim.
By its very terms, the cartage agreement referred to MVP as an independent contractor. As such, MVP maintained sole control over the manner and means of its performance:
"3.3 Manner of Performance. Subject to the terms and conditions of this Agreement, the manner and means by which Contractor performs the Services shall be at Contractor's sole discretion and control and are Contractor's sole responsibility, including, with respect to (a) the hours and days worked by Contractor Workers, (b) the selection and supervision of Contractor Workers and (c) the number of Contractor Vehicles used by Contractor in providing the Services. Contractor shall have the sole right to determine all aspects of its performance of its obligations under this Agreement, including the staffing, operation, and routing of the Contractor Vehicles in the Service Areas ...." (Cartage agreement § 3.3 [emphasis added].)
***314 This "manner of performance" provision clearly establishes the parties' intent that MVP would maintain control over the operation of its vehicles. DHL did not have authority to make decisions affecting the day-to-day operations of MVP's vehicles.
The cartage agreement further provides MVP with exclusive control over the purchase and maintenance of its delivery vehicles (see id. § 3.5.1 ["Contractor Vehicles. Without limiting the generality of Section 3.3, Contractor, at its sole cost and expense, shall obtain, furnish, operate, and maintain in good working condition such Contractor Vehicles as may be necessary for Contractor to perform the Services in accordance with the provisions of this Agreement " (emphasis added) ] ). Moreover, MVP was solely responsible for the licensing, registration, and insurance of its delivery vehicles (see id. §§ 3.5.2, 12.1 ["(MVP) shall, at its sole cost and expense, maintain in effect continual insurance coverage *507 **117 .... All such insurance coverages ... shall be primary to, and shall receive no contribution from any other insurance maintained by, on behalf of, or benefitting DHL" (emphasis added) ] ). Finally, the agreement specified that MVP was responsible for the hiring, training, and firing of all its employees (see id. § 3.4). Clearly, pursuant to the cartage agreement, MVP maintained direct control over the purchase, operation, and maintenance of its vehicles-and more. MVP, among other things, selected individual drivers, selected delivery routes, loaded and unloaded the vehicles, and furnished the vehicles with gas and other supplies.
As the majority notes, the cartage agreement contained strict regulations for, among other things, the vehicles' operating and performance standards, the vehicles' markings, employee uniforms, and employee standards of conduct. DHL also had the right to inspect MVP's records and audit its compliance with the agreement. MVP even used DHL's facilities and housed its vehicles on site. The majority stresses these aspects of the business relationship in holding that there is a cognizable factual dispute here (see majority op. at 300-301, 67 N.Y.S.3d at 106-08, 89 N.E.3d at 496-98). However, none of these requirements in the cartage agreement-with the limited exception of vehicle performance standards-affect the MVP vehicles in their functional or operational capacities. The markings requirement, for instance, simply reflects DHL's control over its own intellectual property and brand, not the vehicle itself. Accordingly, even assuming DHL exercised some "supervisory powers," MVP was still an independent contractor responsible for its own performance (see ***315 Chicago Ins. Co. v. Farm Bur. Mut. Ins. Co. of Ark., Inc., 929 F.2d 372, 374 [8th Cir.1991] ).
Absent any indication that DHL specifically hired MVP's vehicles for its own exclusive control, there can be no "hired auto" coverage as a matter of law (see American Cas. Co. of Reading, Pa. v. Denmark Foods, 224 F.2d 461, 463 [4th Cir.1955] ). I would therefore hold that MVP-an independent contractor solely responsible for the purchase, operation, and maintenance of its vehicles-exercised such exclusive control over the vehicle so as to preclude "hired auto" coverage.
B.
That result is the same one we reached in Dairylea Coop. v. Rossal, 64 N.Y.2d 1, 483 N.Y.S.2d 1001, 473 N.E.2d 251 (1984). There, R & H Hauling, an independent contractor, entered into a hauling contract with Dairylea Cooperative, Inc. and an accompanying lease agreement for a tanker truck. Several months later, R & H purchased the tanker with Dairylea retaining a security interest. The truck, which was still titled in Dairylea's name, was subsequently involved in an accident with another vehicle while being driven by an R & H employee. After a jury returned a verdict for the plaintiff in the underlying personal injury action, Dairylea and R & H's insurers initiated a declaratory judgment action to determine coverage. Much like the insurance policies at issue here, Dairylea's insurance policy defined an insured as "any other person while using an owned automobile or a hired automobile with the permission of the named insured" ( id. at 9, 483 N.Y.S.2d 1001, 473 N.E.2d 251 ).
We held in Dairylea that the truck did not constitute a "hired auto" under Dairylea's insurance policy. In doing so, we emphasized the fact that the hauling contract between the parties called for R & H to transport milk as an independent contractor, and did not require the use of a *508 **118 particular tanker to perform that service (see id. at 9-10, 483 N.Y.S.2d 1001, 473 N.E.2d 251 ). Even though Dairylea still had title to the truck and the truck still carried license plates issued to Dairylea, we concluded that "it cannot be said in any realistic sense that once the ... agreements and note were executed, Dairylea had any control over use of the tanker or could grant R & H permission to use it" ( id. at 10, 483 N.Y.S.2d 1001, 473 N.E.2d 251 ). We further observed that "[a]s the owner of the tanker, R & H had the right to use it without permission from Dairylea or anyone else" (id. ).
Similarly, here, the cartage agreement between DHL and MVP explicitly refers to MVP as an independent contractor.
***316 The agreement makes no mention of specific vehicles to be used in the performance of the contract. The agreement is a contract for MVP's services-not its vehicles-and, as owner of those vehicles, MVP retained significant control over their operation. In short, Dairylea is not meaningfully distinguishable from the instant case, compelling the same result.[3]
Our decision in Dairylea reflects the nationwide consensus on "hired auto" coverage (see e.g. Toops v. Gulf Coast Mar. Inc., 72 F.3d 483, 487 [5th Cir.1996] ["(I)n order for a vehicle to constitute a hired automobile it must be under the named insured's exclusive use or control"]; Sprow v. Hartford Ins. Co., 594 F.2d 418, 422 [5th Cir.1979] ["(F)or a vehicle to constitute a hired automobile, there must be a separate contract by which the vehicle is hired or leased to the named insured for his exclusive use or control"]; Russom v. Insurance Co. of N. Am., 421 F.2d 985, 993 [6th Cir.1970] ["Where there is a separate contract hiring or leasing a vehicle in addition to an agreement to haul a particular load, courts have held that the vehicle becomes a 'hired automobile' "]; Phillips v. Enterprise Transp. Serv. Co., 988 So.2d 418, 422 [Miss.Ct.App.2008] [citing Toops and Sprow for the proposition that the vehicle must be hired or leased for the named insured's exclusive use or control] ). Courts have also held that independent contractor status cannot create "hired auto" coverage as a matter of law (see e.g. Chicago Ins. Co., 929 F.2d at 374 ; Transport Indem. Co., 620 F.2d at 1371 ; American Cas. Co., 224 F.2d at 463 ).[4] Accordingly, based on the face of the cartage *509 **119 agreement, plaintiff cannot, as a matter of law, meet his burden of proving coverage (see ***317 Consolidated Edison Co. of N.Y. v. Allstate Ins. Co., 98 N.Y.2d 208, 218, 746 N.Y.S.2d 622, 774 N.E.2d 687 [2002] ).
C.
Relying on the standard of review on a motion to dismiss, the majority holds that "[w]hether MVP was an insured under DHL's policies presents a question of fact to be resolved by the trier of fact" (majority op. at 295-296, 67 N.Y.S.3d at 103, 89 N.E.3d at 493 [internal quotation marks omitted] ). According to the majority, "the insurance policies do not define 'hired auto,' and neither the Appellate Division nor defendants point to any industry-standard definition" (id. at 299, 67 N.Y.S.3d at 106, 89 N.E.3d at 496). The majority opinion then relies heavily on an expert affidavit proffered by plaintiff to conclude that a jury should determine whether the vehicle was a "hired auto." The majority even implies that a "missing" schedule of hire, which is purportedly "essential to [the] determination of the full content of the contract," is admissible through the parol evidence rule (id. at 298-299, 67 N.Y.S.3d at 106, 89 N.E.3d at 496).
But "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" ( Greenfield v. Philles Records, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 [2002] ). The rule's operation is no different in the context of insurance contracts: "[w]here the terms of an insurance policy are clear and unambiguous, interpretation of those terms is a matter of law for the court" ( Town of Harrison v. National Union Fire Ins. Co. of Pittsburgh, Pa., 89 N.Y.2d 308, 316, 653 N.Y.S.2d 75, 675 N.E.2d 829 [1996] ; see also White v. Continental Cas. Co., 9 N.Y.3d 264, 267, 848 N.Y.S.2d 603, 878 N.E.2d 1019 [2007] ["(U)nambiguous provisions of an insurance contract must be given their plain and ordinary meaning"] ). We have, in Dairylea, defined the parameters of hired auto coverage, consistent with the interpretations adopted by courts in a number of states, and that definition should govern here. Yet, instead, the majority impermissibly uses extrinsic evidence "to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face" ( W.W.W. Assoc. v. Giancontieri, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 [1990] ).[5] Consequently, under the majority's holding, a plaintiff may now use extrinsic evidence to alter the express terms of an insurance policy whenever an insurer moves to dismiss the action.
***318 Insurers rely on the established meaning of legal terms to define the scope of coverage and the concomitant level of risk; "[t]he meaning of such provisions is not an issue of fact to be litigated anew each time a dispute goes to court" (Unigard Sec. Ins. Co., Inc. v. North Riv. Ins. Co., 4 F.3d 1049, 1071 [2d Cir.1993] ). Under the majority's interpretation, plaintiffs may now point to information outside the four corners of the governing insurance contract to generate ambiguity and manufacture a "triable issue of fact."
The majority also appears to suggest that MVP and William Porter had implied permission to operate the vehicle under Vehicle and Traffic Law § 388(1) (see majority op. at 302-303, *510 **120 67 N.Y.S.3d at 108-09, 89 N.E.3d at 498-99). That statute provides that
"[e]very owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner" ( Vehicle and Traffic Law § 388 [1 ] ).
By definition, however, section 388 only applies to an "owner of a vehicle used or operated in this state" (id. § 128). It is undisputed that MVP-not DHL-owned the van and, pursuant to section 388, MVP is the party that must give permission.
The majority also relies on the public policy considerations underlying section 388. In Motor Veh. Acc. Indem. Corp. v. Continental Natl. Am. Group Co., for example, we held that a driver of a rental car had the constructive permission of the owner, overcoming the permissive-use restrictions found in the lease agreement ( 35 N.Y.2d 260, 264-265, 360 N.Y.S.2d 859, 319 N.E.2d 182 [1974] ). Later, in Murdza v. Zimmerman, we explained that "[o]ur finding of constructive consent-despite the owner's restrictions-rested, in part, on the public policy concerns surrounding the large number of vehicles placed on the road by businesses that rent cars to others for profit, and the inevitability that these vehicles will 'become involved in their fair share of accidents' " ( 99 N.Y.2d 375, 380, 756 N.Y.S.2d 505, 786 N.E.2d 440 [2003], quoting Motor Veh. Acc. Indem. Corp., 35 N.Y.2d at 263, 360 N.Y.S.2d 859, 319 N.E.2d 182 ). If anything, these cases undermine the majority's position.
The constructive permission theory applied in Motor Veh. Acc. Indem. Corp. and Murdza is intended to ensure that a ***319 financially responsible defendant, as owner or renter, cannot avoid liability by claiming an insolvent user did not have actual permission (see Morris v. Snappy Car Rental, 84 N.Y.2d 21, 27, 614 N.Y.S.2d 362, 637 N.E.2d 253 [1994] ). But DHL is not a car rental company leasing numerous cars for profit with restrictive use agreements that limit its exposure to liability. DHL contracted with MVP for its services in a commercial, arms' length agreement-not a rental agreement. DHL required MVP to keep, at a minimum, a $1 million liability insurance policy-well above the minimum automobile liability coverage required in New York State (see Vehicle and Traffic Law § 345[b][3] [requiring motorists to carry a minimum amount of liability insurance of $50,000 for death of one person, $100,000 for death of two or more people, and $10,000 for property damage in any one accident] ). The public policy underlying these constructive permission decisions-involving owners placing "fleets of vehicles" on the road with the risk that restrictive rental agreements will leave injured plaintiffs without recourse to an insured motorist-is simply not implicated here.
The case before us involves a straightforward application of contract interpretation and settled insurance law. Rather than apply those established principles, the majority's approach permits litigants to introduce extrinsic evidence to create ambiguity in contracts, upsetting not only our own precedent but the settled expectations of parties to commercial agreements. I would instead apply our long-standing precedent and affirm the Appellate Division's holding that the vehicle was not a "hired auto."
III.
Affirming on these grounds would dispose of the case without consideration of the second issue-the application of *511 **121 Insurance Law § 3420 (a). Reaching the issue, the majority misinterprets section 3420(a) in a manner that enacts sweeping change across the Insurance Law, generating substantial implications, both known and unknown.
Section 3420 (a) of the Insurance Law mandates specified provisions to be included in certain insurance policies and contracts "issued or delivered in this state." Section 3420(b), in turn, provides a direct cause of action "against the insurer upon any policy or contract of liability insurance that is governed by [ section 3420(a)(2) ], to recover the amount of a judgment against the insured or his personal representative."
***320 In other words, " Insurance Law § 3420 grants an injured plaintiff the right to sue a tortfeasor's insurance company to satisfy a judgment obtained against the tortfeasor" ( Lang v. Hanover Ins. Co., 3 N.Y.3d 350, 352, 787 N.Y.S.2d 211, 820 N.E.2d 855 [2004] ).
In order to recover under Insurance Law § 3420, a plaintiff must first establish that the policy sued upon was "issued or delivered" in New York (Insurance Law § 3420[a] ; American Continental Props. v. National Union Fire Ins. Co. of Pittsburgh, 200 A.D.2d 443, 446, 608 N.Y.S.2d 807 [1st Dept.1994] ). This requirement is a statutory prerequisite; failure to satisfy it will result in dismissal for lack of capacity to sue (see Lang, 3 N.Y.3d at 354-355, 787 N.Y.S.2d 211, 820 N.E.2d 855 ). The right to sue a tortfeasor's insurance company to satisfy a judgment obtained against that tortfeasor did not exist at common law, and therefore section 3420 -a statute in derogation of the common law-must be narrowly construed (see Lang, 3 N.Y.3d at 353, 787 N.Y.S.2d 211, 820 N.E.2d 855 ; Matter of Allstate Ins. Co. v. Rivera, 12 N.Y.3d 602, 609 n., 883 N.Y.S.2d 755, 911 N.E.2d 817 [2009] ).
The majority holds that dismissal of the cause of action against AAIC was improper under the standard announced in Preserver Ins. Co. v. Ryba, 10 N.Y.3d 635, 862 N.Y.S.2d 820, 893 N.E.2d 97 (2008). In Preserver, we considered a different provision of section 3420 - section 3420(d)(2) -which requires insurers to meet certain requirements to "disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state." At the time, section 3420(d) applied to insurance policies "delivered or issued for delivery in this state" (former Insurance Law § 3420[d] [emphasis added] ).[6] Interpreting the first part of that phrase, we observed that the policy was "actually delivered" outside of New York and, turning to the second part of that phrase, we held that "[a] policy is 'issued for delivery' in New York if it covers both insureds and risks located in this state" ( 10 N.Y.3d at 642, 862 N.Y.S.2d 820, 893 N.E.2d 97 ). Specifically, we held that the policy at issue was not "issued for delivery" in New York because the insured was "a New Jersey company, with its only offices located in that state," and therefore could not be considered an insured located in New York (id. ).
"Issued for delivery"-the phrase then used in section 3420(d) -is not the phrase used in section 3420(a) -the provision ***321 at issue here. Instead, section 3420(a) provides that the policy must be "issued or delivered " in New York (emphasis added). Those phrases-"issued or delivered" (used in section 3420[a] ) and "delivered or issued for delivery" (formerly used in section 3420 [d] )-are two distinct phrases in *512 **122 the Insurance Law that, our cases make clear, have quite different meanings.
In holding that an insurance policy is "issued for delivery" if it covers both insureds and risks in New York, the Preserver Court cited American Ref-Fuel Co. of Hempstead v. Employers Ins. Co. of Wausau ( Preserver, 10 N.Y.3d at 642, 862 N.Y.S.2d 820, 893 N.E.2d 97, citing American Ref-Fuel Co., 265 A.D.2d 49, 53, 705 N.Y.S.2d 67 [2d Dept.2000] ). American Ref-Fuel held that an insurance policy was "issued for delivery" in New York where the policy expressly listed, as a named insured, a New York corporation ( 265 A.D.2d at 53, 705 N.Y.S.2d 67 ). In so holding, the Court expressly noted that "the language in issue here, 'delivered or issued for delivery in this [S]tate' differs from the language in ... Insurance Law § 3420(a), applicable to policies 'issued or delivered in this [S]tate' " ( American Ref-Fuel, 265 A.D.2d at 52, 705 N.Y.S.2d 67 [emphasis added] ). To highlight the distinction between the two phrases, American Ref-Fuel contrasted another case, American Continental Props. v. National Union Fire Ins. Co. of Pittsburgh, which construed the "issued or delivered" language as limited to where the policy had been physically signed and executed ( American Continental Props., 200 A.D.2d 443, 446-447, 608 N.Y.S.2d 807 [1st Dept.1994] ). Evidently, the Preserver Court was not only aware of the distinction between the two phrases-"issued for delivery" and "issued or delivered"-but relied on that distinction in defining "issued for delivery."
The majority asserts that, "[i]f anything, 'issued or delivered' is facially broader than 'issued for delivery' " (majority op. at 307, 67 N.Y.S.3d at 112, 89 N.E.3d at 502). This misrepresents the former statutory language in Insurance Law § 3420(d), which covered policies "delivered or issued for delivery" in the state ( Preserver, 10 N.Y.3d at 642, 862 N.Y.S.2d 820, 893 N.E.2d 97 ). The true crux of the dispute here is whether the term "issued" (in this state) is facially broader than, or identical to, the phrase "issued for delivery" (in this state) and, when presented in that manner, the question must plainly be answered in the negative.
Recognizing the distinction between the terms, the Appellate Division in this case properly dismissed the cause of action against AAIC: "The parties and the court have improperly conflated the phrase 'issued or delivered' with 'issued for delivery,' which was used in the former version of ***322 Insurance Law § 3420(d), and therefore the definition of 'issued for delivery' is not relevant here." ( Carlson, 130 A.D.3d at 1477-1478, 16 N.Y.S.3d 637.) The excess policy was issued by AAIC from New Jersey and delivered to the insured in Washington and then in Florida. Thus, the policy was not "issued or delivered in this state" as that phrase is ordinarily understood ( id. at 1478, 16 N.Y.S.3d 637 ; see also Taggert v. Security Ins. Co. of New Haven, Conn., 277 App.Div. 1051, 1051, 100 N.Y.S.2d 563 [2d Dept.1950] ["A policy of insurance is issued when it is delivered and accepted, whereby it comes into full effect and operation as a binding mutual obligation, or when it is prepared and signed, as distinguished from its delivery to the insured"]; cf. American Continental Props., 200 A.D.2d at 446-447, 608 N.Y.S.2d 807 [questioning where the endorsements were signed and therefore finding a question of fact as to whether a policy was "issued or delivered" in New York] ).
Rather than give "issued or delivered" the plain meaning it has previously been assigned, the majority-attempting to rectify a perceived injustice-defines two distinct terms to have identical meaning **123 *513 (Statutes § 236, Comment ["When ... the Legislature uses unlike terms in different parts of a statute, it is reasonable to infer that a dissimilar meaning is intended"]; Matter of Albano v. Kirby, 36 N.Y.2d 526, 530, 369 N.Y.S.2d 655, 330 N.E.2d 615 [1975] ). In doing so, the majority rewrites the Insurance Law to make "issued or delivered" mean "issued for delivery" each and every time it appears-and it frequently appears (see Insurance Law §§ 1101[b] [2][C] ; 1213[a], [d]; 3102[b][1][F]; [3]; [c] [1]; [f][1], [2]; 3221[k] [6] [A], [B]; [l][5][B][i]; [p][3][E][ii]; 3407 [a], [b]; 3446[c]; 3451[a] [1]; 3452[a][1]; 4106, 4207[c]; 4216[c][2]; 4231[d], [g][1][D], [E]; 4306, 4510[c]; 6409[a] ). Given the sharp change in the meaning of "issued or delivered," and the frequency with which that phrase is used, the majority's holding will surely wreak havoc well beyond this case. The majority's assertion that its holding may be confined to Insurance Law § 3420 is belied by our rules of statutory construction, which will not allow us to disregard the plain language of other Insurance Law provisions, identical to that interpreted here, due to variances in context or legislative history, as the plain language of the statute is paramount and we can hardly ascribe differing meanings to like terms found throughout the Insurance Law.
Moreover, the majority's claim that a literal interpretation of the phrase "issued or delivered" would permit insurers to ***323 regularly insure risks located in New York while simultaneously avoiding application of the Insurance Law is exaggerated and unavailing. The legislative intent of the provisions at issue was to alter the common-law rule that " 'an injured person possessed no cause of action against the insurer of the tort feasor' ... because there was no privity of contract between plaintiff and the insurance carrier" ( Lang, 3 N.Y.3d at 353, 787 N.Y.S.2d 211, 820 N.E.2d 855, quoting Jackson v. Citizens Cas. Co., 277 N.Y. 385, 389, 14 N.E.2d 446 [1938] ). This legislative intent is still effected by giving the terms "issued or delivered" their plain meaning because New York residents may, contrary to the common-law rule, pursue actions (in accordance with section 3420 ) directly against an insurer who issues or delivers an automobile insurance policy in New York. Significantly, New York residents will still benefit from an insurance policy issued or delivered outside the state-they just may not be able to sue the insurer directly in New York.[7] Indeed, the legislature has seen fit to ensure that policies that may not be issued or delivered in the state, but which cover automobiles that present a significant risk to the residents of New York, must comply with specific provisions of the Insurance Law (see e.g. Insurance Law §§ 3420[e] [governing any insurance policy issued or delivered by an authorized insurer "upon any such vehicle or aircraft or vessel then principally garaged or principally used in this state"]; 3411, 3412 [governing insurance policies on vehicles "registered in this state"] ). The majority's interpretation ignores these plain language distinctions. **124 *514 While the majority claims that it is "simply not plausible" to conclude that the legislature intended to exclude policies issued or delivered outside the state because of the potential burden on New York residents in pursuing insurers in their home states, it is hardly plausible that the legislature intended to require every automobile insurer throughout the country-regardless of where the policy was issued or delivered-to comply with New York insurance statutes on the chance that ***324 the insured vehicle may be driven into New York.[8] Given that many of the provisions of section 3420 governing policies issued or delivered in the state govern the relationship between the insured and the insurer, it is also hardly plausible that the New York Legislature intended to dictate the relationship between out-of-state insureds and out-of-state insurers. It is questionable whether the legislature would even have the authority to do so (see 8 Steven Plitt et al., Couch on Insurance § 111:27 [3d ed.] ["(a) state legislature does not have the power to prescribe the contents of insurance policies that are issued or delivered outside of that respective state's borders"] ).
This unhappy result may be avoided-the vehicle was not a "hired auto" and we should leave it at that. I respectfully dissent.
Orders modified, without costs, by denying defendants' motions to dismiss the first cause of action and, as so modified, affirmed.
Judges RIVERA, FEINMAN and ENG* concur; Judge GARCIA dissents in an opinion, in which Chief Judge DiFIORE and Judge STEIN concur; Judge FAHEY taking no part.

Subject to certain limitations, section 3420(b) provides that "an action may be maintained ... against the insurer upon any policy or contract of liability insurance ... to recover the amount of a judgment against the insured or his personal representative" (see section III, infra ).

"Other factors in determining control may include control over the driver of the vehicle, control of decisions affecting the operations of the vehicle, responsibility for maintenance of the vehicle, and responsibility for maintaining liability insurance for the vehicle" (8A Steven Plitt et al., Couch on Insurance § 118:49 [3d ed.] ).

The majority suggests that Dairylea is distinguishable because "the policy at issue there specifically excluded from coverage 'the owner of a non-owned automobile,' and there was 'no question that ... the tanker was not owned by Dairylea' " (majority op. at 302 n. 5, 67 N.Y.S.3d at 108 n. 5, 89 N.E.3d at 498 n. 5, quoting Dairylea, 64 N.Y.2d at 9-10, 483 N.Y.S.2d 1001, 473 N.E.2d 251 ). But "the policy definition of 'insured' included in addition to Dairylea, 'any other person while using an owned automobile or a hired automobile with the permission of the named insured ' " (Dairylea at 9, 483 N.Y.S.2d 1001, 473 N.E.2d 251 [emphasis added] ). We held that "the tank farm milk hauling contract" between Dairylea and R & H did not "constitute the tanker a hired automobile within the meaning of that provision" (id. at 9-10, 483 N.Y.S.2d 1001, 473 N.E.2d 251 ).

The majority asserts that MVP's status as an independent contractor is just another "factor to be weighed with others" and "is not dispositive of the issue of control" (majority op. at 301, 67 N.Y.S.3d at 107, 89 N.E.3d at 497). But the cases cited from this Court address whether an employment relationship exists within the meaning of the unemployment insurance law (see Matter of Rivera [State Line Delivery Serv.-Roberts], 69 N.Y.2d 679, 682, 512 N.Y.S.2d 14, 504 N.E.2d 381 [1986] ; Matter of Empire State Towing & Recovery Assn., Inc. [Commissioner of Labor], 15 N.Y.3d 433, 437, 912 N.Y.S.2d 551, 938 N.E.2d 984 [2010] ). Employment is defined broadly within the meaning of the unemployment insurance law to effectuate its remedial purpose (see Labor Law §§ 501, 511 [1 ] ). Those policy concerns do not apply here.

Indeed, the majority fails to note that plaintiff originally conceded that the terms of the policies were unambiguous.

This "issued for delivery" language was later amended to "issued or delivered" (see Insurance Law § 3420[d][2], as amended by L. 2008, ch. 388, § 5).

States may explicitly provide for such actions under appropriate circumstances (see e.g. Wis. Stat. § 803.04 [2][a] ["If the policy of insurance was issued or delivered outside this state, the insurer is ... made a proper party defendant only if the accident, injury or negligence occurred in this state " (emphasis added) ]; La. Stat. Ann. § 22:1269 [B] [2] ["This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana " (emphasis added) ] ).

While the majority may take issue with this statement, its opinion provides no basis for drawing a distinction between an insured who drives a vehicle into New York and causes an accident and the situation presented here, where the purported insured has a business in New York. Indeed, the majority opinion raises many questions regarding whether and when an insured and risk would be located in New York. For example, what will occur when an out-of-state resident owns property in New York, or works in New York, or simply vacations regularly in New York, and drives a vehicle into the state? Will the out-of-state insurers of an insurance policy delivered out of state be subject to direct suit in New York under such circumstances? It would appear so under the majority's interpretation.

Designated pursuant to N.Y. Constitution, article VI, § 2.